**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------

NMS SPECIAL OPPORTUNITY FUND, LP, a Delaware limited partnership,

Plaintiff,

-against-

NPFC SPV 1, Inc., NFG SA, Newpoint Reinsurance Company Limited, Keith Beekmeyer, and Andrew Bye,

Defendants.

-------------------------------------------------------

Case No.:

**COMPLAINT**

Plaintiff NMS SPECIAL OPPORTUNITY FUND, LP, by and through its attorneys, FROST LLP, complaining of Defendants NPFC SPV 1, Inc., NFG SA, Newpoint Reinsurance Company Limited, Keith Beekmeyer, and Andrew Bye, hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, fraud, fraudulent inducement, conversion, and unjust enrichment arising out of Defendants' scheme to induce Plaintiff NMS Special Opportunity Fund, LP ("NMS") to initially purchase 2,000 Newpoint Financial Corp.'s Series E Preferred Shares in exchange for NMS delivering $200 million ($200,000,000) in Senior Secured Note secured by a pledge and backed by certain U.S. Treasury ("NMS Notes") to Defendant NPFC SPV 1, Inc. (f/k/a Newpoint Financial Corp.) ("NPFC") based on knowingly false representations regarding NPFC's financial strength, and Defendants' subsequent refusal to honor their contractual obligations to NMS. Upon completion of the transaction with NMS, NPFC would then issue its own secured notes ("NPFC Notes") to insurance and reinsurance counter parties as solvency capital, which were on the first part, backed by the U.S. Treasury-backed NMS Notes, but were

ultimately backed and guaranteed by NPFC's purported cash pursuant to the terms of the transaction documents. The agreement between NPFC and NMS obligated NPFC to fully indemnify and hold NMS harmless from any risk of any claim against the NMS Notes and/or any claim against the underlying pledged U.S. Treasury notes. The Defendants then solicited NMS to purchase an additional 8,000 Series E Preferred Shares in NPFC in exchange for $800 million ($800,000,000) in NMS Notes pursuant to an Amendment Agreement to the original transaction documents dated December 7, 2021 ("First Amendment"). Upon closing NPFC had sold and issued a total of 10,000 Series E Preferred Shares to NMS in exchange for Senior Secured Notes with a total notional amount of $1 billion ($1,000,000,000).

2. Defendants carried out their scheme with the following structure:

(a) NPFC issued and sold to NMS the Series E Preferred Shares in exchange for NMS delivering the NMS Notes, to NPFC;

(b) Upon closing the transaction with NMS, NPFC then issued its own secured notes ("NPFC Notes") to insurance and reinsurance counterparties including other subsidiaries of NFG as solvency capital, which NPFC falsely represented were solely secured by the NMS Notes backed by the pledged U.S. Treasuries; and

(c) The NPFC Notes were in fact ultimately backed and guaranteed by NPFC's purported cash held at Doha Bank, pursuant to the terms of the transaction documents with NMS.

3. The agreement between NPFC and NMS obligated NPFC to fully indemnify and hold NMS harmless from any risk of any claim against the NMS Notes and/or any claim against the underlying pledged U.S. Treasury notes.

4. Between 2021 and 2024, Defendants NPFC, NFG SA ("NFG"), Keith Beekmeyer,

and Andrew Bye engaged in a systematic scheme to defraud NMS and other counterparties by misrepresenting NPFC's cash position and financial strength. Among other things, Defendants NPFC and Keith Beekmeyer induced NMS to enter into the Series E Preferred Stock Purchase Agreement on July 19, 2021 for the initial 2,000 Series E Shares in exchange for $200 million ($200,000,000) of NMS Notes by representing that NPFC maintained a cash position of in excess of $2 billion ($2,000,000,000), purportedly backed by cash deposits at Doha Bank. Defendants Beekmeyer and NPFC then solicited NMS to increase their Series E Preferred Share purchase by an additional 8,000 Series E Preferred Shares, again, representing that the NPFC maintained cash position was in excess of $2 billion ($2,000,000,000), purportedly backed by cash deposits at Doha Bank.

5. To further demonstrate and perpetrate their misrepresentations, defendants Beekmeyer, on behalf of NFG and NPFC, presented to Trevor Saliba ("Saliba") of NMS that NFG's reinsurance company, Newpoint Reinsurance Company Limited ("NPRE"), a St. Kitts and Nevis licensed insurance company, was an existing successful reinsurance firm with purported revenue of approximately $44,309,866 in 2019 and approximately $26,357,599 in 2020, as reflected in NPRE's purported financial statements for those years. Defendants presented NPRE as having a "proven" track record of their business strategy utilizing Beekmeyer's "structured note strategy" as an inducement to NMS to enter into the agreement. Based on information learned after, Plaintiff is informed and believes that the premium revenues represented in the NPRE 2019 and 2020 financial statements are inflated and overstated.

6. The NPFC purported cash position was represented as demonstrating NPFC's ability to perform in the event of any claim of the NMS Notes and/or of the underlying pledged U.S. Treasury Notes pursuant to the transaction documents. On the strength of this supposed "no

risk" cash guarantee, NPFC and Beekmeyer negotiated a significantly lower participation dividend on the NPFC Series E shares, covering all income earned by NPFC, NFG or its affiliates in their use of the NPFC Notes.

7. In reality, Beekmeyer knew at the time he negotiated and entered into the transaction with NMS that NPFC's representation of purported cash at Doha Bank was false. Having already invested approximately $100 million ($100,000,000) of the purported cash-linked NPFC Notes into the NFG subsidiary, NPRE, as solvency and equity capital, Beekmeyer urgently needed to find replacement capital for the non-existent Doha Bank funds. In response to his crisis, Beekmeyer solicited NMS and proposed the "new" transaction structure, without disclosing that he already knew the Doha Bank cash did not exist for approximately two to three months prior. Beekmeyer used this concealment as a negotiating tactic on two fronts: (1) to induce NMS into entering into the agreement with NPFC by representing the transaction as financially secure, and (2) to justify a dividend rate for the NPFC Series E shares far below market, on the premise that the deal carried little to no risk. Months after NPFC and NFG's default, in preparing for litigation and reviewing all files available to it, NMS subsequently discovered Beekmeyer's own testimony on the Doha Bank cash confirming this: in his August 4, 2023 SEC deposition, Beekmeyer had admitted that he knew as early as April or May 2021 that the account at Doha Bank was not real and that the Doha Bank purported cash position did not exist.

8. Despite the same, NPFC, NFG, Beekmeyer, and Bye continued to solicit and enter into transactions with NMS, NPRE, and other United States and foreign insurance company counterparties, using the purported cash-linked NPFC Notes that Defendants knew could not be backed by the cash reserves they had represented. Defendants knowingly and falsely represented to these counterparties that the Notes were backed solely by U.S. Treasury securities through the

NMS Notes. As reflected in Defendants' own internal NPFC Note allocation records, attached hereto as Exhibit A, NPFC issued NPFC Notes in at least thirty (30) separate transactions between December 2021 and 2025, totaling more than  $1.1 billion ($1,101,344,254.21) in aggregate, the substantial majority of which were entered into principally for the financial benefit of Defendant NPRE, an NFG subsidiary, which generated more than $700 million ($700,000,000) in aggregate revenue from 2021 through 2024 for NPRE as a direct result of the NPFC Notes' capital structure. Of this amount, $110,000,000 remained outstanding as of November 2025, consistent with the NMS's Notes' outstanding face value alleged in Paragraph 157. Examples of such transactions include the following:

**2021 NPFC Notes - Related Party and Third Party Transactions**

(a) $150,000,000 issued to Newpoint Reinsurance Company Limited, a St. Kitts and Nevis licensed insurance carrier as an investment in exchange for shares;

(b) $25,000,000 issued to Citadel Reinsurance Company Limited, a Bermuda licensed insurance carrier as an investment in exchange for shares;

(c) $10,000,000 issued to American Millenium Insurance Company, a wholly owned subsidiary of Citadel Reinsurance Company Limited and New Jersey licensed insurance carrier as an investment in exchange for shares;

(d) $50,000,000 issued to Novea, Inc., a fintech warranty business in exchange for shares; and

(e) $10,000,000 issued to Specialty Management Limited (now know as Specialty MGA), a London based MGA licensed with the FCA.

**2022 NPFC Notes – Related Party and Third Party Transactions**

(a) $5,000,000 issued to Osso Energy PLC, a wholly owned subsidiary of NFG and

London based gas supplier that is regulated by OFGEM;

(b) $10,000,000 issued to Newpoint Insurance Brokers Ltd., (now knows as QRG Brokers Limited), a subsidiary of NFG and London based licensed insurance mediary and Lloyds broker regulated by the FCA;

(c) $25,000,000 issued to Perfuturo Insurance, a Guam licensed insurance carrier in exchange for shares; and

(d) $10,000,000 issued to NPRE for the benefit of Starstone, a licensed insurance carrier, to satisfy NPRE's contractual reinsurance capital obligations under a reinsurance trust agreement.

**2023 NPFC Notes – Related Party and Third Party Transactions**

(a) $15,000,000 issued to NPRE for the benefit of Mid-Hudson Mutual, a licensed insurance carrier to satisfy NPRE's contractual reinsurance capital obligations under a reinsurance trust agreement;

(b) $10,000,000 issued to NPRE for the benefit of Trailblazers, a licensed risk retention group to satisfy NPRE's contractual reinsurance capital obligations under a reinsurance trust agreement;

(c) $40,000,000 issued to Patrons Reinsurance Company, an Indiana licensed insurance carrier;

(d) $10,000,000 issued to NFG Partners SA, a subsidiary of NFG and FINMA licensed financial services firm based in Geneva;

(e) $20,000,000 issued to NPRE for the benefit of Trisura Specialty and Trisura Insurance, both license insurance carriers to satisfy NPRE's contractual reinsurance capital obligations under a reinsurance trust agreement; and

(f) $20,000,000 issued to NPRE for the benefit of Suttons National and Suttons Specialty, both license insurance carriers to satisfy NPRE's contractual reinsurance capital obligations under a reinsurance trust agreement.

9. Defendants induced NMS to enter into the Series E Preferred Stock Purchase Agreement by representing that NPFC maintained a cash position initially excess of $7.9 billion ($7,900,000,000) and then this amount was reduced to $2 billion, purportedly with cash deposits at Doha Bank secured by purported transaction documents by and between NPFC, Doha Bank and the representative account holder. These representations were material to NMS's decision to enter into the Series E Agreement and to accept a low profit participation dividend of five percent (5%) and to also mitigate any risk of claim or call against its own NMS Notes. In reliance on these representations, NMS agreed to deliver $200 million and then increased to $1 billion in NMS Notes to NPFC in exchange for 2,000 and then 8,000 Series E Preferred Shares over two transactions in July 2021 and December 2021 respectively. In 2025, after having failed to cure default notices issued by NMS, the Defendants then proposed to amend the Series E agreement through a reduction and repurchase of Series E shares from NMS resulting in NMS retaining approximately 1,100 Series E Preferred Shares as detailed in the Series E Preferred Stock Repurchase Agreement dated October 24, 2025.

10. Defendants have failed to honor their contractual commitments to NMS under the Series E Agreement and as amended, the Master Repurchase Agreement dated July 21, 2021 (the "MRA"), and the subsequent amendment Series E Preferred Stock Repurchase Agreement dated October 24, 2025 (the "Repurchase Agreement"). Specifically, Defendants failed to pay to NMS Preferred Share Dividends totaling $156,158.45 and Profit Participation Dividends totaling $4,199,567.36. Defendants also failed to deliver to NMS equity interests to which NMS was

contractually entitled, including 750 NPRE 2% Preference Shares or the cash equivalent, 7,500,000 NPRE ordinary shares or the cash equivalent, 159,905 Osso Energy PLC ordinary shares or the cash equivalent, and documentation reflecting NMS's 5% participation interest in Specialty Risk Partners USA Inc. shares or the cash equivalent. Defendants also failed to segregate and maintain the NPFC Note Capital Reserve as contractually required.

11. In 2025, following NPFC's failure to perform, NMS sought to enforce its rights and demanded payment of the defaulted balances due and return of its NMS Notes following NPFC's and NFG's defaults, Defendants asserted pretextual collateral-verification defenses that were inconsistent with the transaction structure and contradicted by Defendants' treatment of identical structures in other transactions. These defenses were raised for the first time in September 2025—more than four years after the transaction closed and only after Defendants had already defaulted on their payment obligations.

12. As a direct and proximate result of this fraud, Plaintiff has suffered damages in an amount to be determined at trial but believed to exceed $114,355,725.81, consisting of (a) $110 million ($110,000,000) owed under the MRA for NPFC's failure to return the NMS Notes following NMS's declaration of an Event of Default, as alleged in Paragraphs 156-158 below; and (b) $4,355,725.81 in unpaid preferred share dividends and profit participation dividends under the Series E Agreement, as amended, as alleged in Paragraph 80-81 below, exclusive of the value of the undelivered equity interests described in Paragraphs 69-72, which are not yet reduced to a sum certain.

## PARTIES

13. Plaintiff NMS Special Opportunity Fund, LP ("NMS") is a limited partnership organized and existing under the laws of the State of Delaware. NMS's general partner is NMS

Capital Management GP, LLC, a Delaware limited liability company. NMS Capital Management GP, LLC's sole member is NMS Capital Group, LLC, a Delaware limited liability company. NMS Capital Group, LLC's sole member is Trevor Saliba, a citizen of the State of California. NMS's Series A limited partner is Bteghrine Trust Holdings, LLC, a Delaware limited liability company, whose members are Trevor Saliba, a citizen of the State of California, and two minor citizens of the State of California. NMS's Series B limited partners are Christopher Botosan, a citizen of the State of Arizona, and GVT Global Trust, a trust organized under the laws of the State of Florida, whose trustee is a citizen of the State of Arizona. Accordingly, no general or limited partner of NMS, nor any member of NMS Capital Management GP, LLC or NMS Capital Group, LLC is a citizen of Wyoming, Switzerland, the United Kingdom, the Federation of Saint Kitts and Nevis, and NMS's citizenship is completely diverse from that of every Defendant named herein.

14. Defendant NFG is a corporation organized under the laws of Switzerland with its principal place of business in Geneva, Switzerland with the decision-making executive officers and shareholders operating out of London, United Kingdom.

15. Defendant NPFC is a corporation organized under the laws of the State of Wyoming with its principal place of business in Sheridan, Wyoming. NPFC is a wholly owned subsidiary of NFG.

16. Defendant Newpoint Reinsurance Company Limited ("NPRE") is an international business corporation incorporated under the laws of Nevis, within the Federation of Saint Kitts and Nevis, and is registered with the Nevis Financial Services Regulatory Commission under registration number C46027. NPRE maintains its principal place of business in Charlestown, Nevis, Saint Kitts and Nevis. NPRE is a subsidiary of Defendant NFG.

17. Defendant Keith Beekmeyer is a citizen and resident of the United Kingdom and

serves as Chief Executive Officer of NFG and President of NPFC and a Director of NPRE. Throughout the relevant period, Beekmeyer exercised de facto control over NPFC, NFG, NPRE, and related entities, including by structuring the NPFC Note program, making representations to NMS and other counterparties regarding NPFC's financial condition, and directing the use of NPFC Notes for the benefit of NPRE.

18. Defendant Andrew Bye is a citizen and resident of the United Kingdom who serves as Chief Risk Officer and Director of NFG and Director of NPFC and the Executive Director (CEO) of NPRE. Bye worked alongside Beekmeyer in structuring and promoting the NPFC Note program to insurance and other counterparties with knowledge that NPFC's transactions were not ultimately backed by the pledge of U. S. Treasuries but were ultimately backed by non-existent cash through Doha Bank.

**ALTER EGO ALLEGATIONS**

19. NPFC, NFG, and NPRE operated not as separate, independently governed corporations, but as a single, integrated enterprise dominated and controlled by Beekmeyer and, to a lesser extent, Bye, with respect to the NPFC Note program and the transactions with NMS described herein.

20. At all relevant times, Beekmeyer served simultaneously as Chief Executive Officer of NFG, President of NPFC, and Director of NPRE; and Bye served simultaneously as Chief Risk Officer and Director of NFG, Director of NPFC, and Executive Director (CEO) of NPRE. No other individuals exercised independent decision-making authority over these entities with respect to the NPFC Note program.

21. NPFC and NFG failed to observe corporate formalities in connection with the NPFC Note program, including by: (a) producing, in response to a deposition subpoena, purported

board minutes for a December 29, 2021 meeting of Newpoint Financial Corp.'s board of directors that were unsigned, which Beekmeyer—despite being one of only two members of that board—testified he could not authenticate or confirm reflected any meeting that actually took place; (b) operating with a board of directors consisting of only two individuals—Beekmeyer and Bye—who simultaneously held overlapping executive, director, and officer positions across NFG, NPFC, and NPRE; and (c) failing to maintain contemporaneous, verifiable records establishing when board minutes were drafted relative to the meetings they purported to reflect, such that Beekmeyer testified he could not determine whether the December 29, 2021 minutes were prepared before, during, or after any such meeting occurred.

22. NPFC, NFG, and NPRE, including other NFG subsidiaries routinely commingled and transferred funds derived from the NPFC Notes among themselves without regard to corporate formalities or arm's-length dealing, including by using proceeds designated for the NPFC Note Capital Reserve to finance "overall group operations" and the benefit of NFG, NPRE and other affiliates, as alleged in Paragraph 79, and by assigning NPFC's rights and obligations under the Series E Agreement to NFG via the Security Assignment, as alleged in Paragraph 143.

23. Beekmeyer's and Bye's domination of NPFC, NFG, and NPRE and other affiliates enabled them to divert the proceeds of the NPFC Notes—including the approximately $100 million invested into NPRE before NMS even entered the Series E Agreement, and the ongoing revenues and equity interests described in Paragraphs 67-72—out of NPFC (the contracting entity) and into NPRE, an undercapitalized entity, thereby placing the value NMS is owed beyond NPFC's own reach and NMS's ability to collect on its claims. NMS's injury—the inability to recover amounts owed under the Series E Agreement, the MRA, and the Repurchase Agreement—was the direct and proximate result of this domination.

24. Accordingly, NPFC and NFG are the alter egos of one other, and each is the alter ego of NPRE, such that the corporate form should be disregarded and each may be held liable for the obligations of the others, and NPRE is separately subject to this Court's personal jurisdiction by virtue of NFG's and NPFC's contacts with New York as alleged in Paragraphs 26-27.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction of this civil action pursuant to 28 U.S.C. §1332(a). As set forth in Paragraph 13, NMS's citizenship—determined by the citizenship of each of its general and limited partners, and, in turn, by the citizenship of each member of its general partner, NMS Capital Management GP, LLC—is completely diverse from that of every Defendant. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

26. This Court has personal jurisdiction over Defendant NPFC because NPFC, as a signatory to the Master Repurchase Agreement dated July 21, 2021 (the "MRA")—expressly governed by New York law and providing for performance in New York—transacted business within the State of New York, and this action arises directly from that business.

27. This Court has personal jurisdiction over Defendant NFG because NFG, as a signatory to the Series E Preferred Stock Repurchase Agreement dated October 24, 2025 ("the Repurchase Agreement") —expressly governed by New York law "without giving effect to any choice or conflict of law provision or rule . . . that would cause the application of laws of any jurisdiction other than those of the State of New York." Further, "[a]ny legal suit, action, or proceeding out of or based upon [the Repurchase Agreement] may be instituted in the federal courts of the United States of America or the courts of the State of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. NFG further transacted business in New York through Beekmeyer's actions as NFG's

Chief Executive Officer, described herein, which were undertaken within the scope of his office and in furtherance of NFG's interests.

28. This Court has personal jurisdiction over Defendant NPRE because, at all relevant times: (1) NPRE directed, controlled, or was otherwise involved in NPFC and NFG's negotiations with NMS; (2) NPRE knew of and ratified the Series E transaction; and (3) NPRE's use of the NPFC Notes was the specific purpose for which Beekmeyer solicited NMS. NPRE further purposefully availed itself of the benefits of transactions governed by New York law by knowingly accepting and profiting from more than $1.1 billion in NPFC Notes negotiated and intended to be performed in New York, and by directing its affiliates NPFC and NFG—who acted as NPRE's agents with NPRE's consent and ratification—to solicit and negotiate with NMS for NPRE's direct financial benefit.

29. This Court has personal jurisdiction over Beekmeyer because Beekmeyer, acting on behalf of NFG, transacted business within the State of New York in connection with the negotiation, execution, and performance of the Repurchase Agreement, a New York-governed contract, and this action arises from that business. Beekmeyer further committed tortious acts, including tortious interference with contract and fraud as alleged herein, that were directed at NMS and caused injury in connection with contracts governed by New York law and providing for performance and dispute resolution in New York. Beekmeyer further directed NPFC to enter into the Series E Agreement with NMS, a sophisticated investor, for the purpose of providing legitimacy to the NPFC Note program, in furtherance of NFG's and his own interests.

30. This Court has personal jurisdiction over Defendant Andrew Bye because Bye, acting on behalf of NFG and NPFC, transacted business within the State of New York in connection with the negotiation, execution, and performance of New York-governed transaction

documents providing for performance and dispute resolution in New York, and this action arises from that business. Bye further committed tortious acts, including fraud and fraudulent inducement as alleged herein, directed at NMS and causing injury in connection with those contracts.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims—including the negotiation, execution, and intended performance of contracts governed by New York law—occurred in or were directed at this District. Venue is further proper as to NPFC and NFG because, in the Repurchase Agreement § 14, each irrevocably submitted to exclusive jurisdiction of the federal courts of the United States or the courts of the State of New York for any suit, action, or proceeding arising out of or relating to the Agreement.

## GENERAL ALLEGATIONS

### Background: Beekmeyer's Knowledge of Transaction Structure Limitations

32. In November 2019, Beekmeyer met with Trevor Saliba of NMS for the first time in person in London. Beekmeyer represented that he had recently received investment backing of approximately $500 million from a United States based family and that he was seeking expand his collateral mix proposing a new securitization structure utilizing U.S. Treasury securities for his purported solvency-capital business.

33. At that meeting, Saliba explained to Beekmeyer that the NMS Notes and underlying pledged U.S. Treasuries could not be directly liened and explained the parameters and limitations governing the pledge, verification, and permitted uses of the pledged U.S. Treasuries.

34. Beekmeyer represented that he was taking a different Newpoint entity, Newpoint Financial Corp. (Delaware), public and that he was represented by U.S. counsel Craig Beling. This was the first discussion of a possible structure involving the NMS's U.S. Treasury-backed

notes. As a result of Beekmeyer not being able to adhere to the verification and lien parameters described by Saliba combined with agreeing to mitigated risk required by NMS, no deal proceeded at that time.

35. In May and June 2020, Beekmeyer again approached Saliba about revisiting the U.S. Treasury pledge transaction structure. It is presumed that Beekmeyer approached Saliba on the basis that the previously referenced family office who had provided a purported $500 million in cash investment was either not real or that the family office and Beekmeyer had a following out. At that time, Beekmeyer was advised by California-based attorney Craig Beling and represented that his bank, Union Bancaire Privée ("UBP") Luxembourg, could carry out institutional bank-to-bank confirmation.

36. During this process, Mr. Beling made due diligence inquiries to NMS's counsel, Withers Bergman LLP, regarding the UST account holder. Withers Bergman provided information explaining account holder's background and additional parameters surrounding the USTs. In addition, UBP was ultimately unable to verify the account within the agreed parameters. As a result, Beekmeyer subsequently notified Saliba by email that the transaction could not proceed for a second time.

37. By mid-2020, verification issues and limits on institutional confirmation of the U.S. Treasuries were already known to Beekmeyer and had been actively discussed not only with Beekmeyer, but with his legal counsel.

**NPFC's Launch of the Cash-Linked Note Program**

38. On July 30, 2020, NPFC entered into an agreement with Gauntlet Holdings, LLC, Ali Derakhshanfar, and Darrell Rideaux for a cash-linked note program (referred to by Beekmeyer in sworn testimony as "CLNs" or "credit-linked notes") allegedly backed by approximately $7.9

billion held at Doha Bank in an account affiliated with a member of the Qatari royal family. NPFC then launched its own cash-linked note program, issuing the notes defined herein as the "NPFC Notes," under which NPFC would issue purportedly cash-backed notes using the same structure.

39. This cash-linked note program served as the foundation for NPFC's later representations to NMS and other counterparties regarding NPFC's financial strength and liquidity.

40. Beekmeyer had represented to Saliba that NPFC, Doha Bank, and the representative account holder had entered into a contractual agreement related to the purported $7.9 Billion cash. Following the closing of the first 2,000 Series E Purchase, and as part of NMS's due diligence in connection with the request from Beekemyer to increase the NMS Note coverage, Beekmeyer committed to providing documentation to evidence NPFC's financial strength.

**Beekmeyer's Knowledge That Doha Bank Cash Did Not Exist**

41. According to Beekmeyer's testimony in his August 4, 2023 SEC deposition, in response to questioning, he replied that he was aware by April or May 2021 that the purported Doha Bank cash was fake. This testimony evidences that the representations made to NMS in July 2021, subsequent discussions related to the solicitations by NPFC to NMS to increase their NMS Note coverage and further representations related to the amended agreement in December 2021 regarding NPFC's cash strength and financial condition were knowingly false or misleading.

42. Notwithstanding his knowledge that the Doha Bank cash did not exist, Beekmeyer nevertheless continued to expand the NPFC Notes structure. Specifically, Beekmeyer caused NPFC to enter into the Series E transactions with NMS in July 2021 and again in December 2021, and caused NPFC to prepare and present to NMS the September 30, 2021 financial statement referenced in Paragraph 62 and the November 20, 2021 balance referenced in Paragraph 63—each

which continued to represent that NPFC held a legitimate cash position at Doha Bank notwithstanding Beekmeyer's knowledge to the contrary. During this same period, NPFC, under the direct supervision of Bye and Beekmeyer, continued to issue NPFC Notes that were invested into NPRE as purported solvency and equity capital, as alleged in Paragraphs 67-72, for the direct benefit of NPRE and other NFG affiliates. Beekmeyer and Bye also coordinated multiple subsequent transactions utilizing the NPFC Notes with multiple insurance counter parties and NFG subsidiaries as described herein and on the referenced attached exhibit.

43. Further, during his August 4, 2023 SEC deposition, Beekmeyer testified that Newpoint "did not provide any credit-linked notes to any third party," and that any such notes would only have been provided "having got the verification that it was supported by the cash in the bank at Doha Bank—which we didn't." Beekmeyer further testified that, as of December 2021, he did not believe the Doha Bank account supporting the "CLN program" (i.e., the NPFC Notes program) existed. Despite this knowledge, Newpoint Financial Corp. board minutes dated December 29, 2021 reflect that Beekmeyer and NPFC continued to pursue additional transactions using the same purported Doha Bank cash structure with other counterparties during the same period NPFC was transacting with NMS.

44. Bye, who was also a director and officer of both NFG and NPFC working closely with Beekmeyer, was also aware that NPFC's transactions were falsely backed by cash through Doha Bank. Bye worked alongside Beekmeyer in structuring and promoting the NPFC Note program to other insurance counterparties, specifically in his role as defacto CEO of NPRE where he presented, pitched and sold multiple counter parties that NPRE was trying to enter into reinsurance agreements with about the integral structure of the NPFC Notes being "UST backed",

yet entirely omitting that the ultimate risk and guarantee rested solely with NPFC and the purported Doha Bank cash.

45. Bye's institutional position gave him direct, ongoing access to the same material information Beekmeyer possessed regarding NPFC's true financial condition. As Chief Risk Officer of NFG and as holding the professional designations of ACII (Associateship of the Chartered Insurance Institute) and SIRM (Senior Insurance Risk Manager), Bye's core professional function was to evaluate and manage precisely the type of counterparty, credit, and structural risk presented by the NPFC Note program—including the purported Doha Bank cash backing that program. As a Director of NPFC and NFG and Executive Director of NPRE, Bye held governance-level authority and access to financial information across all three entities central to the scheme. As Bye is a seasoned insurance industry professional, he was fully aware that the omission of the factual details related to the NPFC Note and underpinning collateral was a breach of professional and ethical standards. Beekmeyer represented to NMS, both before and during the negotiation of the Series E Agreement and after the closing of the first July 2021 transaction that he discussed all material aspects of the NPFC Note program and the NMS transaction with Bye, consistent with Bye's role and responsibilities as Chief Risk Officer. Bye also communicated with NMS on risk matters related to NPRE's underwriting strategy related to its approach to insurance risk. Bye worked directly alongside Beekmeyer in structuring and promoting the NPFC Note program to NMS and other counterparties.

**The Series E Transaction Structure**

46. The Series E transaction was structured by Beekmeyer as a multi-step process: (1) NMS delivered the NMS Notes, backed by U.S. Treasury securities, to NPFC as payment consideration for the Series E Preferred Shares; (2) NMS's interest in those U.S. Treasuries was

secured pursuant to the Collateral Pledge Agreement; (3) NPFC first issued 2,000 Series E Preferred Shares to NMS as consideration for the NMS Notes and then later issued 8,000 Series E Preferred Shares for additional NMS Notes in December 2021; (4) NPFC then issued its own NPFC Notes to third-party counterparties, which were represented by Beekmeyer, Bye and NPFC as being solely backed by or secured by the NMS Notes and the pledged U.S. Treasuries, however omitting the ultimate cash backing and responsible guaranteeing party—NPFC, (which effectively rendered the NPFC Notes ability to pay or perform in the event of any claim or call on them dependent on the purported NPFC cash); and (5) the NPFC Notes were in fact ultimately backed and guaranteed by NPFC's purported cash held at Doha Bank, pursuant to the terms of the transaction documents. Each step in this structure is described in further detail below.

47. In early 2021, Beekmeyer contact Saliba to advise him of the structured finance he had just concluded on behalf of NPFC with Doha Bank and one of its largest account holders resulting in NPFC securing a $7.9 billion cash pledge to support a dedicated NPFC Cash Linked Note Program. Beekmeyer described the transaction as closed, that their law firm, Clyde & Co had advised them on the transaction in all pertinent areas from legal, regulatory and structural. Beekmeyer then inquired if Saliba was aware of any companies that may be in need of solvency capital that he could introduce.

48. Saliba referred to NMS Consulting, which is a management consulting and strategic advisory firm working with various clients. In particular, Saliba introduced an NMS Consulting client, Novea Inc. ("Novea"). Novea launching a fintech warranty platform and was in need of capital to support its risk capital. Ultimately, NPFC and Novea entered into a Memorandum of Understanding dated May 4, 2021 which outlined specific investment deal terms whereby NPFC

would invest approximately $50,000,000 in the form of Cash-Backed Credit Link Notes ("CLN") in exchange for Novea issuing Convertible Preferred Shares to NPFC, amongst other provisions.

49. As the NPFC-Novea transaction proceeded with both sides beginning to engage in their respective due diligence, in or around June 2021, during a video conference call discussing updates on the NPFC-Novea deal, Beekmeyer started discussing with Saliba about revisiting the NMS Note transaction structure, however, he described as a "new deal structure" involving NMS Fund's U.S. Treasury-backed Notes as Beekmeyer was intimately familiar with both their attributes, more importantly their limitations based on his previous two attempts to put a transaction in place with NMS. During this call, and then over a series of conference calls, Beekmeyer described and explained to Saliba that he had created a structure that would adhere all of NMS' preinformed conditions and parameters and in short, Beekmeyer stated to Saliba "Let me show you how to use the NMS collateral to make money in the insurance industry."

50. Under this new Beekmeyer structure, Beekmeyer proposed that NMS would acquire 2,000 NPFC Series E Preferred Shares in exchange for NMS Fund's U.S. Treasury-backed Notes. Beekmeyer told Saliba of NMS that the "new deal structure" purportedly provided "no risk" to NMS, as NPFC would fully indemnify NMS against any claim asserted against the NMS U.S. Treasury-backed Notes. This was a key component in NMS's decision to enter into the Series E transaction.

51. As part of the due diligence by Beekmeyer and NPFC, NMS provided all transaction documents and information in connection with U.S. Treasuries that were pledged to NMS, the account holder and counterparty to NMS to both Beekmeyer and his legal counsel. In addition, both through telephone and video calls, and email, Beekmeyer and his legal counsel made multiple inquiries confirming all facts related to the NMS Note structure on a fully disclosed basis.

52. On July 19, 2021, NPFC and NMS entered into a Convertible Redeemable Preferred Stock Purchase Agreement (the "Series E Agreement," attached as Ex. B) prepared by Beekmeyer's legal counsel whereby NMS agreed to acquire two thousand (2,000) shares of NPFC's Series E Convertible Redeemable Preferred Stock in exchange for NMS delivering U.S. Treasury-backed notes (the "NMS Notes").

53. That same day, NPFC and NMS entered into a Collateral Pledge and Security Agreement (the "Collateral Pledge Agreement," attached as Ex. C), prepared by Beekmeyer's legal counsel whereby NMS pledged the USTs to NPFC as collateral securing the Note. In Section 5(a) of the Collateral Pledge Agreement, NPFC and NMS expressly represented that NMS held a "perfected first priority security interest" in the USTs and that NPFC's own interest in the Collateral was likewise perfected upon execution and UCC filing. NPFC therefore admitted, in writing, that this same collateral structure gave NPFC a valid, perfected security interest.

54. On July 21, 2021, NPFC and NMS entered into a Master Repurchase Agreement ("MRA," attached as Ex. D) prepared by Beekmeyer's legal counsel obligating NPFC to purchase the Series E Preferred Shares in the event of any claim against the NPFC Notes. This MRA served as a key risk-allocation mechanism and was material to NMS's agreement to accept only a 5% participation coupon.

55. On October 28, 2021, NMS and NPFC executed an Amended and Restated Zero Coupon Collateralized Secured Senior Note (the "Note"), amending and restating the original note dated July 21, 2021, in the original principal amount of $2 billion ($200,000,000).

56. Shortly after the July 2021 closing, as a result of Beekmeyer and Bye entering into multiple transactions utilizing their own NPFC Notes, Beekmeyer started approaching NMS about increasing the amount. Subsequent discussions were carried out and Beekmeyer and NPFC

provided additional information on NPFC and NPRE, specifically, updated NPFC financial statements which now included the NMS Notes in exchange for the Series E Preferred Shares and the purported $2 billion ($2,000,000,000) cash at Doha Bank.

57. On December 7, 2022, NMS and NPFC entered in a second share purchase by executing a First Amendment to the Note (the “First Amendment to Note,” attached as Ex. E), which increased the Note’s amount again to $1 billion ($1,000,000,000), and redefined the Series E Convertible Redeemable Preferred Stock to mean ten thousand (10,000) shares of NPFC’s Series E Convertible Redeemable Preferred Stock, at $100,000.00 per share, for an aggregate value of $1 billion ($1,000,000,000)—an increase of an additional 8,000 shares from the 2,000 shares originally sold under the Series E Agreement.

58. On the same day, NMS and NPFC executed a First Amendment to the Second Convertible Redeemable Preferred Stock Purchase Agreement (the “First Amendment to Purchase Agreement”), which deleted Section 3.1(k)(i)-(iii) of the Purchase Agreement in their entirety, and replaced them as follows: Section 3.1(k)(ii), as amended, provides that “[c]ommencing January 1, 2023, the Series E Preferred Stock shall pay a dividend fee equal to six (6) basis points of the total Stated Value per annum (‘Preferred Share Dividend’), paid monthly in arrears due and payable on the last day of each calendar month,” continuing “until the earlier of the Series E Preferred Stock expiry or redemption.” Section 3.1(k)(iii), as amended, provides that the Series E Preferred Stock “shall also pay a profit participation dividend (‘Profit Participation Dividend’) equal to five percent (5%) of all income earned and received by Purchaser or its parent company or affiliates from its use of the Notes including but not limited to coupon or interest payments, equity payments, warrants or any other fees earned by Purchaser, the parent company or its affiliates and subsidiaries,” calculated and paid quarterly in arrears.

59. Prior to concluding the July 2021 transaction documents, NMS provided all transaction documents between itself and U.S. Treasury account holder to Beekmeyer, NPFC, and their attorney, fully disclosing the identity of the account holder and addressing any inquiries related to potential controversies surrounding the account holder and the governing documents that provided NMS Fund's rights and limitations to the U.S. Treasuries.

60. Beekmeyer's new structure did not require the confirmation or direct lien of the U.S. Treasuries, and Beekmeyer proceeded with full knowledge of the identity of the U.S. Treasury account holder, controversies, and limitations of the securitization structure.

**NPFC's Represented Financial Strength**

61. Prior to and in connection with NMS's entry into the Series E Agreement on July 19, 2021, NPFC, through Beekmeyer, represented to NMS that NPFC maintained a cash position in excess of $7.9 billion ($7,900,000,000), purportedly held at Doha Bank, and that this cash position demonstrated NPFC's financial strength and its ability to perform its obligations to NMS. Beekmeyer represented that he had entered into an agreement with both Doha Bank and the representative account holder related to the $7.9 billion ($7,900,000,000) cash.

62. These representations were made to NMS through, among other things, NPFC's financial statement dated December 31, 2020 and NPFC's Private Placement Memorandum dated February 2021, both of which were provided to NMS prior to the execution of the Series E Agreement and represented that NPFC held cash and cash equivalents in excess of $7.9 billion ($7,900,000,000). NPFC's subsequent September 30, 2021 financial statement, which was provided as part of the solicitation of the additional 8,000 Series E Preferred Shares showed a reduced cash balance of $2 billion ($2,000,000,000) and the NMS Notes.

63. On November 20, 2021, Beekmeyer sent an email to NPFC's Chief Financial

Officer, Gary Shirshac, instructing him to prepare an adjusted NPFC Balance Sheet by cancelling certain preferred share classes and reducing the purported NPFC cash position to $2,000,000,000.00. On November 20, 2021, Gary Shirshac, on behalf of NPFC and at the instruction of Beekmeyer, transmitted its balance sheet as of September 30, 2021, to Saliba, on behalf of NMS, via email. The balance sheet represented that NPFC held a reduced cash balance of approximately $2,000,000,000 at Doha Bank as instructed by Beekmeyer, attached hereto as Exhibit F.

64. Due to NPFC's purported significant cash strength of more than $7.9 billion ($7,900,000,000) which would serve as the front stop and guarantee preventing any potential claim against the NMS Notes or the underlying pledged UST, NMS agreed to a low participation dividend of five percent (5%).

65. The transaction was material to NMS because NPFC's represented financial strength was the foundation for NPFC's ability to honor its obligations under the MRA to repurchase the Series E Preferred Shares and return the NMS Notes in the event of default.

66. **NPFC's Use of the NPFC Notes for the Benefit of NPRE**

67. Between 2021 and 2024, NPFC used NPFC Notes in transactions totaling more than $1.1 billion ($1,100,000,000), primarily benefiting NPRE.

68. NPRE's own corporate share registers confirm the scale of this benefit. NFG—NPFC's subsidiary and NPRE's sole shareholder of record—was issued a total of 151,000,000 NPRE ordinary shares in three tranches: 1,000,000 shares on December 31, 2021; 50,000,000 shares on March 31, 2023 in exchange of NPFC Notes issued to NPRE; and 100,000,000 shares on November 23, 2023 in exchange for NPFC Notes issued to NPRE.

69. NFG was further issued NPRE preference shares with an aggregate value of

$100,000,000: 99,000,000 preference shares on November 24, 2022 and 1,000,000 preference shares on March 31, 2023, later cancelled and consolidated into a single 10,000-share certificate on December 5, 2023.

70. The $100,000,000 aggregate value of the NPRE preference shares issued to NFG in November 2022 and March 2023 corresponds to the approximately $100 million in NPFC Notes that, upon information and belief, Beekmeyer had already caused to be invested into NPRE as purported solvency and equity capital prior to soliciting NMS.

71. NPRE's audited yearly statements reported that NPRE's annual revenue was approximately $79,714,958 in 2021, approximately $118,525,365 in 2022, approximately $156,726,000 in 2023, and approximately $346,666,000 in 2024. NPRE's reported annual revenue grew from $79.7 million in 2021 to $346.7 million in 2024, representing a total of more than $700,000,000 in aggregate revenue as a direct result of the NPFC Notes structure.

72. NPRE's balance sheet equity was comprised of approximately 99% of NPFC Notes in exchange for both preferred and common shares of NPRE.

73. On or around May 30, 2023, AM Best assigned NPRE financial strength and long-term issuer credit ratings of "good" with a stable outlook. AM Best stated that the ratings reflected NPRE's "very strong" balance sheet strength and that NPRE's BCAR risk-adjusted capitalization was at the strongest level. At the time, NPRE's balance sheet equity comprised approximately 99% NPFC Notes.

74. Beekmeyer, with the assistance of Bye, entered into multiple transactions with regulated Managing General Agents (MGAs) and United States based and foreign insurers using NPFC Notes and represented that they were solely U.S. Treasury-backed, even though they were contractually ultimately backed only by the $2 billion in cash NPFC claimed to have—cash which

Beekmeyer and Bye knew did not exist. Beekmeyer's and Bye's deliberate omission of the true NPFC Note securitization and underlying collateral being ultimately backed by nonexistent Doha Bank cash and not the U.S. Treasury backed NMS Notes, violated professional and ethical standards to the MGA and Carrier counter parties, their respective regulators and other stakeholders. In addition, these actions present potential liability and exposure to NMS in the event of any claim on the NPFC Notes and their potential default.

**Terms of the Series E Agreement**

75. Under the Series E Agreement, NMS had a profit participation dividend equal to five percent (5%) of all income earned from and received by NPFC and/or its parent company (NFG) or affiliated (including NPRE). This includes, but is not limited to, coupon or interest payments, equity payments, warrants, or any other fees earned where the NPFC Notes are being used with external or internal counterparties.

76. In addition to cash Profit Participation Dividends, NMS is entitled to Profit Participation Dividends in connection with equity shares acquired by NFG or its affiliates with the use of the NPFC Notes.

77. Additionally, as part of the original transaction, NPFC and NFG agreed to escrow into a cash reserve sinking fund an amount equal to four percent (4%) of the notional value of any NPFC Notes issued in any transaction (the "NPFC Note Capital Reserve"), which would also serve as an additional assurance to NMS of payment of the participation dividends due.

78. The NPFC Note Capital Reserve was to create sufficient cash reserves with the intention of either replacing the NPFC Notes at a later date and/or to be distributed upon the retirement of the NPFC Note program as additional firm profit. Again, another key risk mitigation deal term that further convinced NMS to enter into the transaction with NPFC.

79. From the outset, despite repeated assurances to NMS, NPFC and NFG failed to segregate 4% per annum of the NPFC Notes deals into a cash reserve account as agreed. Instead, NPFC and NFG used these proceeds to finance overall group operations and for the benefit of NPRE and other affiliates.

**NPFC and NFG's Breaches and Defaults**

80. As of June 1, 2026, NPFC owes NMS $156,158.45 in unpaid Series E Preferred Share Dividends accrued under Section 3.1(k)(ii) of the Purchase Agreement, as amended by the First Amendment to Purchase Agreement.

81. As of June 1, 2026, NPFC owes NMS $4,199,567.36 in unpaid Profit Participation Dividends accrued under Section 3.1(k)(ii) of the Purchase Agreement, as amended by the First Amendment to Purchase Agreement.

82. NPFC has failed to deliver to NMS 750 NPRE two percent (2%) Preference Shares plus remittance of all past due coupons earned proportionate to the NMS allocated shares.

83. NPFC failed to deliver to NMS 7,500,000 NPRE ordinary shares to NMS.

84. NPFC failed to deliver to NMS 159,905 Osso Energy PLC ordinary shares to NMS.

85. NPFC failed to deliver to NMS documentation sufficient to identify the number of shares acquired in Specialty Risk Partners USA Inc. and to reflect NMS's five percent (5%) participation interest in those shares.

86. In October 2025, NFG advised NMS of its intention to amend the existing agreement and retire the NPFC Note program and proposed redeeming approximately 8,950 NPFC Series E Preferred Shares in exchange for return of corresponding NMS Notes.

87. On or around October 24, 2025, NMS, NPFC, and NFG entered into a Series E Preferred Stock Repurchase Agreement (the "Repurchase Agreement") whereby NMS agreed to

sell to NPFC, and NPFC agreed to repurchase from NMS, 8,950 of the Shares (the "Repurchased Shares") such that NMS would hold 1,050 Shares (the "Remaining Shares"). The Parties reduced the size of the NMS Note to U.S. $105,000,000.

88. Following this closing, NMS learned that NFG and NPFC had miscalculated the current outstanding NPFC Notes, and only 8,900 were to be repurchased, leaving $110,000,000 of outstanding NPFC Notes. NPFC was running the note/share program and had sole access to the relevant information and records, making NMS completely dependent on NPFC's representations.

89. Under the Series E Repurchase Agreement, NPFC agreed to pay all dividends under the Purchase Agreement by October 31, 2025.

90. NPFC failed to pay to NMS the outstanding dividend amount of $156,158.45; $4,199,567.36 in profit participation dividends; the 750 NPRE two percent (2%) Preference Shares including remittance of all past due coupon payments; the 7,500,000 NPRE ordinary shares to NMS; the 159,905 Osso Energy PLC ordinary shares; and he 5% Specialty Risk Partners USA Inc. participation interest by October 31, 2025.

91. Pursuant to Section 10 of the Series E Repurchase Agreement, NFG guaranteed the performance and payment obligations of NPFC under the various agreements.

**NMS's Exercise of Remedies Under the MRA**

92. On October 1, 2025, NMS issued a Notice of Default/Demand to Cure to NPFC and NFG.

93. On December 11, 2025, NMS issued a Notice of Material Breach and Demand for Immediate Payment and Performance.

94. On January 20, 2026, in light of NPFC's breaches of the Purchase Agreement and the NPFC and NFG breach of the Repurchase Agreement, NMS exercised its rights to declare an

Event of Default and force the redemption of all shares in exchange for return of the NMS Notes (free and clear of any encumbrance or lien) as payment.

95. On January 20, 2026, NMS issued a Notice of Event of Default and Exercise of Remedies under the MRA.

96. To date, NPFC has failed to return the NMS Notes.

97. On February 4, 2026, NMS issued its MRA termination statement/close-out amount notice, identifying the $110,000,000 Series E redemption component, outstanding dividends, and outstanding profit participation.

98. On May 14, 2026, counsel for NMS sent a formal demand letter to NPFC and NFG's counsel demanding immediate payment of all outstanding amounts and return of the NMS Notes.

**NPFC and NFG's Pretextual Defenses**

99. On September 8, 2025, Beekmeyer sent NMS a letter unilaterally declaring that NPFC would recognize the program size as only $105,000,000, effective September 1, 2025, notwithstanding that NMS never agreed to any such reduction. Beekmeyer characterized this letter as NPFC's "final position."

100. On September 9, 2025, NPFC wrote NMS proposing to amend the Series E documents effective September 1, 2025 to reduce the Note and corresponding U.S. Treasury collateral to $105,000,000 and to reduce the Series E Shares from 10,000 to 1,050.

101. In the same September 9, 2025 letter, NPFC further demanded confirmation that NMS provided a "perfected first priority security interest" and "continuing first priority lien and security interest" in the U.S. Treasuries and, absent cure within 30 days, NPFC reserved the right to seek recovery of sums paid, cease further payments, and exercise set-off.

102. This was the first time in more than four years that NPFC tied the proposed Series E reduction to an alleged first-priority perfection issue and began using that issue as leverage against NMS's rights. Furthermore, such claims would be both redundant and contradict the contractual rights NPFC/NFG had to NMS Fund under the MRA.

103. On September 23, 2025, NPFC sent a follow-up letter asserting that its amendment proposal was just a proposal but insisted that "first-priority perfected" status was fundamental to the Series E bargain.

104. In the September 23, 2025 letter, NPFC stated that, because the U.S. Treasuries were investment securities, "first-priority perfection" ordinarily required control under Articles 8 and 9 of the UCC, and demanded extensive control/perfection evidence, including a securities account control agreement or equivalent Euroclear control mechanics, custodian account details, UCC searches, lien releases, account statements, and closing opinions.

105. On October 1, 2025, NMS responded to NPFC's September 23, 2025 letter and expressly rejected the assertion that "first-priority perfection" required a control agreement or Euroclear-equivalent control mechanics. NMS stated that the Series E transaction documents did not consider control, that the cited provisions did not impose such an obligation, and that any attempt to impose new control rights would amount to an impermissible renegotiation.

106. On January 21, 2026, NFG and NPFC issued a formal demand for collateral documentation, asserted "Secured Party" status, and stated that the Repurchase Agreement transactions had not closed.

107. On January 29, 2026, NFG issued a detailed response asserting that NPFC and NFG were "Secured Parties," that the amended transaction as memorialized in the Repurchase Agreement transactions had not closed, that NMS's documentation failures prevented closing, and

that rescission/restoration of the Note principal might be available.

108. On April 15, 2026, Tasha Kwan of NFG Europe sent a "Notice of Series E Reduction – April 2026," purporting to exercise an option to reduce the NMS Notes by a further $50,000,000 ($25 million for Perfuturo and $25 million for Trailblazers) and asserting that the Notes were "now reduced to $65M."

109. After previously claiming the Repurchase Agreement had not closed and that rescission was available, NFG attempted to invoke the same agreement to claim a further unilateral reduction.

110. Throughout the period when NPFC and NFG were asserting verification and perfection defenses against NMS, neither NFG, NPRE, nor their legal counsel required any U.S. Treasury verification when advising on the Series E Repurchase Agreement or multiple other transactions involving the same underlying collateral structure.

111. When NFG, NPRE, and their counsel entered into transactions using related Medium Term Notes ("MTN") and defended the MTN structure to multiple counterparties, regulators, rating agencies, etc., they exclusively relied on UCC filings rather than requiring direct confirmation of underlying U.S. Treasuries.

112. The identical underlying collateral structure was deemed sufficient when NFG and its counsel, including New York counsel (Fisher Broyles), Jersey counsel (Ogier), and later NY and UK counsel (Pierson Ferdinand), entered into the Series E Repurchase Agreement and multiple other transactions involving the same underlying collateral structure, no such verification was required.

113. Beekmeyer's verification and perfection demands against NMS were pretextual coming years after his group of companies generated hundreds of millions of dollars and only

presented as an attempt to avoid the contractual obligations of payment to NMS. Beekmeyer's use of his NMS Note structure was not limited to the Series E Preferred Share program, Beekmeyer expanded the identical NPFC Note structure by launching a parallel Medium Term Note ("MTN") program of approximately $1.5 billion, using the same unverified collateral structure he designed but was now claiming was deficient, albeit solely in connection with the NPFC payment obligations to NMS.

114. Beekmeyer had no issue with NPRE continuing to benefit from the $110 million of NPFC Notes being used to adhere to NPRE's reinsurance trust capital contributions following the Series E Repurchase Agreement, which continues until the present.

115. This expansion of two separate securitization note structures utilized in more than approximately 30 transactions for the benefit of NFG, NPRE or other NFG affiliates having generated approximately $1 billion in cumulative gross revenue since 2021 for the NFG and NPRE group of companies confirms that Beekmeyer's verification demands were a negotiating tactic at that time to avoid the contractual payment obligations to NMS, not a genuine concern about the structure he designed.

116. Neither NFG, NPRE, nor their legal counsel required any U.S. Treasury verification when advising on the July 2021 and December 2021 Series E Preferred Share Purchase Agreement, the October 2025 Series E Repurchase Agreement or multiple other transactions involving the same underlying collateral structure.

117. **Defendants' Purported Rescission**

118. On May 26, 2026, counsel for NFG sent a letter purporting to rescind each and every one of the agreements memorializing the transactions between NMS and NFG, including the Series E Agreement, the MRA, the Security Assignment, and the Repurchase Agreement.

119. The purported rescission letter asserted that the business relationship between NMS and NFG was based upon consideration tendered by NMS that never existed and that NMS perpetrated a scheme of deception upon NFG.

120. The purported rescission letter asserted that NMS made unequivocal and unconditional representations that the named account holder was the legitimate and sole owner of U.S. Treasury securities and that NMS had been granted an irrevocable pledge and assignment to all rights to the U.S. Treasury securities.

121. The purported rescission letter asserted that upon demand, NMS refused to provide any evidence that NMS has any ownership or control interest in the U.S. Treasury securities.

122. The purported rescission letter asserted that NMS had no legal or factual basis to believe that the account holder had any ownership interests in the U.S. Treasury securities, that account holder's interest in such securities had the monetary value that NMS represented to NFG it had, that NMS had a security interest in the securities, or that any putative security interest was perfected.

123. On June 5, 2026, counsel for NMS responded, rejecting the purported rescission in its entirety and stating that it was factually and legally defective.

124. NMS’s response letter stated that Beekmeyer's demands for additional confirmation were not raised until September 2025, more than four years after first entering into the agreement(s) with NMS and after Beekmeyer concluded approximately 30 transactions for the benefit of his companies generating approximately in $1 billion in cumulative revenue, and only after Beekmeyer’s deliberate and intentional contractual defaults had occurred relating to shareholder dividends, fees, and other contractual obligations, only then were only advanced NPFC, NFG and Beekmeyer.

125. NMS's response letter stated that information concerning the rights associated with the account holder and the referenced U.S. Treasury assets had been provided to NPFC, NFG, and their legal advisors at the relevant time which including multiple occasions from 2019 through 2021.

126. NMS's response letter stated that Saliba offered on multiple occasions to obtain a Newpoint-specific confirmation regarding the underlying assets, and Beekmeyer expressly declined those offers as unnecessary in light of the securitization structures he designed and deployed.

127. NMS's response letter stated that the evidence now confirms the purported Doha Bank cash did not exist and that certain counterparties associated with Defendants have since been criminally indicted. As was subsequently uncovered, Beekmeyer was aware of the nonexistent cash prior to entering into any agreement with NMS, but also in connection with every subsequent transaction involving the NPFC Notes with other counterparties.

**COUNT I – BREACH OF CONTRACT (SERIES E AGREEMENT)**

**(Against NPFC)**

128. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

129. The Series E Agreement, dated July 19, 2021, is a valid and enforceable contract between NMS and NPFC.

130. NMS performed all obligations under the Series E Agreement, including by delivering the NMS Notes as consideration for the Series E Preferred Shares, as required under Section 2.1(c) of the Series E Agreement.

131. Under the Series E Agreement, NPFC was obligated to pay NMS quarterly

Preferred Share Dividends.

132. Under the Series E Agreement, as amended by the First Amendment to Purchase Agreement, NPFC was obligated to pay NMS annual Profit Participation Dividends equal to five percent (5%) of all income earned from and received by NPFC and/or its parent company—NFG—or affiliates from use of the NPFC Notes.

133. Under the Series E Agreement, NPFC was obligated to pay NMS five percent (5%) of any equity shares acquired by NFG or its affiliates with the use of the NPFC Notes, including NPRE Preference Shares, NPRE ordinary shares, Osso Energy PLC shares, and Specialty Risk Partners USA Inc. shares.

134. Under the Collateral Pledge Agreement, NPFC represented and warranted to NMS that NPFC's own interest in the Collateral, including the USTs, was perfected upon execution and UCC filing.

135. NPFC materially breached the Series E Agreement, as amended, by failing to pay NMS $156,158.45 in Preferred Share Dividends accrued under Section 3.1(k)(ii).

136. NPFC materially breached the Series E Agreement, as amended, by failing to pay NMS $4,199,567.36 in Profit Participation Dividends accrued under Section 3.1(k)(iii).

137. NPFC materially breached the Series E Agreement by failing to deliver to NMS 750 NPRE 2% Preference Shares plus past-due coupons.

138. NPFC materially breached the Series E Agreement by failing to deliver to NMS 7,500,000 NPRE ordinary shares.

139. NPFC materially breached the Series E Agreement by failing to deliver to NMS 159,905 Osso Energy PLC shares.

140. NPFC materially breached the Series E Agreement by failing to deliver to NMS

documentation reflecting NMS's 5% participation interest in Specialty Risk Partners USA Inc. shares.

141. As a direct and proximate result of NPFC's breaches, NMS has suffered and continues to suffer damages including the unpaid dividends, unpaid profit participation amounts, and the value of undelivered equity interests, in an amount to be determined at trial but believed to exceed $4,355,725.81.

**COUNT II – BREACH OF CONTRACT (SECURITY ASSIGNMENT)**

**(Against NFG)**

142. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

143. On December 7, 2022, NPFC and NFG entered into the Security Assignment, pursuant to which NPFC, as Assignor, assigned to NFG, as Assignee, all of NPFC's rights, title, and interest in the Note and the Series E Preferred Shares.

144. Under the Security Assignment, NFG expressly assumed all of NPFC's obligations owed to NMS under the terms of the Series E Preferred Stock, and agreed to indemnify NPFC for any cause of action arising from NPFC's failure to perform those obligations.

145. The Security Assignment is a valid and enforceable contract, and NMS is a direct and intended beneficiary of NFG's assumption of NPFC's obligations thereunder.

146. By virtue of the Security Assignment, NFG became directly obligated to NMS for the full and prompt performance of all of NPFC's obligations under the Series E Agreement.

147. NFG materially breached the Security Assignment by failing to perform the obligations it assumed from NPFC, including by failing to ensure payment to NMS of $156,158.45 in Preferred Share Dividends and $4,199,567.36 in Profit Participation Dividends, and by failing

to ensure delivery to NMS of the 750 NPRE 2% Preference Shares, 7,500,000 NPRE ordinary shares, 159,905 Osso Energy PLC ordinary shares, and documentation reflecting NMS's participation interest in Specialty Risk Partners USA Inc. shares.

148. As a direct and proximate result of NFG's breach of the Security Assignment, NMS has suffered and continues to suffer damages in an amount to be determined at trial but believed to exceed $4,355,725.81, together with the value of the undelivered equity interests described herein.

**COUNT III – BREACH OF CONTRACT (MASTER REPURCHASE AGREEMENT)**

**(Against NPFC)**

149. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

150. The MRA, dated July 21, 2021, is a valid and enforceable contract between NMS and NPFC.

151. Under Paragraph 11 of the MRA, upon the occurrence of an Event of Default, the non-defaulting party may declare the Repurchase Date for each outstanding Transaction to occur immediately. Under Paragraph 11(c), because NPFC is the Buyer under the MRA, upon NMS's tender of payment of the aggregate Repurchase Prices, all right, title, and interest in the Purchased Securities—here, the NMS Notes—became deemed transferred to NMS, and NPFC became obligated to deliver the NMS Notes to NMS.

152. NMS performed its obligations under the MRA at all relevant times.

153. On January 20, 2026, in light of NPFC's and NFG's breaches of the Series E Agreement and the Repurchase Agreement as alleged herein, NMS declared an Event of Default under the MRA and exercised its right to force the redemption of all Shares in exchange for return

of the NMS Notes, free and clear of any encumbrance or lien.

154. On January 20, 2026, NMS issued a Notice of Event of Default and Exercise of Remedies under the MRA to NPFC.

155. On February 4, 2026, NMS issued its MRA termination statement and close-out amount notice, identifying $110,000,000 as the outstanding Series E redemption component owed to NMS, together with outstanding dividends and profit participation, as alleged in Paragraphs 80-81 above.

156. NPFC materially breached the MRA by failing to return the NMS Notes to NMS following NMS's declaration of an Event of Default and demand for redemption.

157. NPFC is obligated under the MRA to return the NMS Notes with a face value of $110,000,000 or to pay NMS $110,000,000 in cash.

158. As a direct and proximate result of NPFC’s breach of the MRA, NMS has suffered and continues to suffer damages in the amount of $110,000,000 plus consequential damages, or, in the alternative, is entitled to an order compelling NPFC to return the NMS Notes free and clear of all liens and encumbrances.

**COUNT IV – BREACH OF CONTRACT (REPURCHASE AGREEMENT)**

**(Against NPFC and NFG)**

159. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

160. The Repurchase Agreement, dated October 24, 2025, which amended the original agreement, is a valid and enforceable contract between NMS, NPFC, and NFG.

161. Under the Repurchase Agreement, NMS agreed to sell to NPFC, and NPFC agreed to repurchase from NMS, 8,950 of the Series E Preferred Shares (the “Repurchased Shares”), such

that NMS would retain 1,050 Shares (the "Remaining Shares"), and the Parties agreed to reduce the principal amount of the Note and the corresponding USTs to $105,000,000.

162. NMS performed its obligations under the Repurchase Agreement, including by delivering the stock certificate evidencing the Repurchased Shares as required under Section 8 of the Repurchase Agreement.

163. Under Section 3 of the Repurchase Agreement, NPFC agreed to pay NMS all dividends under the Series E Agreement by October 31, 2025.

164. NPFC materially breached the Repurchase Agreement by repurchasing only 8,900 of the 8,950 Shares required, leaving $110,000,000 of NPFC Notes outstanding--$5,000,000 more than the $105,000,000 the Repurchase Agreement called for. NPFC controlled the note/share program and had sole access to the relevant records, and NMS did not learn of this shortfall until after the Closing, as alleged in paragraph 88 above.

165. Under Section 10 of the Repurchase Agreement, NFG guaranteed, as a continuing guaranty, the full and punctual payment and performance of all principal due and owing under the Note.

166. NPFC materially breached the Repurchase Agreement by failing to pay NMS $156,158.45 in Preferred Share Dividends, accrued under Section 3.1(k)(ii) of the Purchase Agreement as amended, October 31, 2025.

167. NPFC materially breached the Repurchase Agreement by failing to pay NMS $4,199,567.36 in Profit Participation Dividends, accrued under Section 3.1(k)(iii) of the Purchase Agreement as amended, by October 31, 2025.

168. NPFC materially breached the Repurchase Agreement by failing to deliver to NMS 750 NPRE 2% Preference Shares plus past-due coupons by October 31, 2025.

169. NPFC materially breached the Repurchase Agreement by failing to deliver to NMS 7,500,000 NPRE ordinary shares.

170. NPFC materially breached the Repurchase Agreement by failing to deliver to NMS 159,905 Osso Energy PLC shares.

171. NPFC materially breached the Repurchase Agreement by failing to deliver to NMS documentation reflecting NMS's 5% participation interest in Specialty Risk Partners USA Inc. shares.

172. NFG materially breached its guaranty under Section 10 of the Repurchase Agreement by failing to ensure NPFC's payment and performance of the obligations.

173. As a direct and proximate result of NPFC's and NFG's breaches of the Repurchase Agreement, NMS has suffered and continues to suffer damages, including the unpaid dividends, unpaid profit participation amounts, and the value of undelivered equity interests, in an amount to be determined at trial.

**COUNT V – FRAUD UNDER NEW YORK COMMON LAW**

**(Against NPFC, NFG, Beekmeyer, and Bye)**

174. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

175. NPFC represented to NMS, through its financial statement dated December 31, 2020, its Private Placement Memorandum dated February 2021, and its subsequent financial statement dated September 30, 2021, that NPFC maintained a cash position of approximately $7.9 billion and then reduced to $2 billion, purportedly held at Doha Bank.

176. NPFC represented, through these same materials, that its purported cash holdings demonstrated NPFC's financial strength and its ability to perform its obligations under the Series

E Agreement and the MRA, including the obligation to repurchase the Series E Preferred Shares and return the NMS Notes in the event of default.

177. NPFC's representations were false. NPFC's true cash position did not include any legitimate holdings at Doha Bank.

178. Beekmeyer identified himself as NFG's CEO when negotiating with NMS and as such, NMS reasonably believed Beekmeyer to have authority to bind NFG.

179. NFG ratified Beekmeyer's conduct by accepting the benefits of the same.

180. In or around June 2021, Beekmeyer, during a phone call, told Saliba of NMS that the transaction structure he proposed was "no risk" to NMS, because NPFC would fully indemnify NMS against any claim asserted against the NMS Notes.

181. Beekmeyer negotiated the terms of the Series E Agreement directly with Saliba on NMS's behalf, including the 5% Profit Participation Dividend rate, based on the represented "no risk" nature of the transaction.

182. Beekmeyer personally, and repeatedly, assured NMS that the NPFC Note Capital Reserve would be established and maintained as required under the Series E Agreement.

183. As Beekmeyer testified under oath in his August 4, 2023 SEC deposition, when asked whether it was fair to say that "by April or May of 2021, you had drawn the conclusion that the account at [Doha Bank] in Quatar wasn't real," Beekmeyer answered, "Yes." This was before NMS entered into the Series E Agreement in July 2021. Beekmeyer was also aware of this when he solicited and approached NMS to increase the NMS Note coverage in December 2021.

184. Beekmeyer knew his representations regarding NPFC's cash position and the "no risk" nature of the transaction were false when he made them, or made them with reckless disregard for their truth, given his own admitted knowledge that the Doha Bank cash did not exist.

185. Beekmeyer's representations regarding the NPFC Note Capital Reserve were false when made, or made with reckless disregard for their truth. Beekmeyer had already caused approximately $100,000,000 of NPFC Note proceeds to be diverted into NPRE as purported solvency and equity capital before NMS even entered into the Series E Agreement, demonstrating that Beekmeyer's practice of diverting Note proceeds to NPRE rather than segregating them for reserve purposes predated, and continued throughout, his assurances to NMS that the Reserve would be established.

186. NFG is liable for Beekmeyer’s representations and conduct because Beekmeyer made those representations and engaged in that conduct in his capacity as Chief Executive Officer of NFG, within the scope of his authority, and for NFG's benefit.

187. Bye worked directly alongside Beekmeyer in structuring and promoting the NPFC Note program to NMS. Bye, as a member of the NPFC board of directors, directly reviewed and approved all transaction documents with NMS as confirmed by the NPFC Board Resolutions related to the Series E Preferred Share transaction.

188. Bye knew, or recklessly disregarded, that the representations were false. Indeed, Beekmeyer testified in his August 4, 2023 SEC deposition that, at the time the CLN program underlying the NPFC Notes was conceived, Newpoint Financial’s board of directors consisted of only himself and Bye, and that it was Beekmeyer and Bye together who came up with the concept of Newpoint issuing the CLNs that became the NPFC Notes. As a co-originator of the very structure later represented to NMS as cash-backed by Doha Bank, Bye knew, or recklessly disregarded, that no such cash backing existed.

189. The representations were made of then-existing, material fact, not statements of opinion or promises of future performance, and were material to NMS's decision to enter into the

Series E Agreement and to accept a low Profit Participation Dividend of five percent (5%).

190. NPFC, NFG, Beekmeyer, and Bye each knew the representations attributed to them were false at the time made, or made such representations with reckless disregard for their truth.

191. NPFC, NFG, and Beekmeyer made these false representations with the intent to induce NMS to enter into the Series E Agreement and deliver the NMS Notes to NPFC.

192. NMS justifiably relied on the representations in deciding to enter into the Series E Agreement and deliver the NMS Notes.

193. NMS's reliance was justified because Beekmeyer expressly declined NMS's offers to obtain independent, Newpoint-specific confirmation of the underlying assets as unnecessary and because NPFC's own execution of the Collateral Pledge Agreement represented that the parties' collateral structure was properly perfected.

194. As a direct and proximate result of NPFC's, NFG's, Beekmeyer's, and Bye's fraudulent misrepresentations, NMS has suffered damages including the loss of use of the NMS Notes, the unpaid dividends and profit participation amounts, the value of undelivered equity interests, and the loss of the NPFC Note Capital Reserve funds that should have been segregated for NMS's benefit, in an amount to be determined at trial.

**COUNT VI – FRAUDULENT INDUCEMENT UNDER NEW YORK COMMON LAW**

**(Against NPFC, NFG, Keith Beekmeyer, and Andrew Bye)**

195. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

196. Prior to and at the time NMS entered into the Series E Agreement in July 2021, NPFC, Beekmeyer, and Bye made false representations to NMS that NPFC’s cash position and financial strength were sufficient to support NPFC’s obligations under the Series E Agreement and

the MRA.

197. NPFC's representation of a $7.9 billion and then reduced to $2 billion cash position purportedly cash-backed by Doha Bank was a misrepresentation of present, existing fact—not a promise of future performance under the Series E Agreement—made prior to and separate from NPFC's execution of that agreement in the first instance.

198. As Beekmeyer testified under oath in his August 4, 2023 SEC deposition, when asked whether it was fair to say that "by April or May of 2021, you had drawn the conclusion that the account at [Doha Bank] in Qatar wasn't real," Beekmeyer answered, "Yes." This was before NMS entered into the Series E Agreement in July 2021 and then again in December 2021, as well as all connected transactions involving the NPFC Notes with multiple counterparties.

199. Bye knew of the falsity of NPFC's cash representations, or had a reckless disregard of that falsity. As alleged in Paragraph 188 above, Bye co-originated, together with Beekmeyer, the CLN structure underlying the NPFC Notes as one of only two members of Newpoint Financial's board of directors, giving him direct, contemporaneous knowledge of the structure's actual, and non-existent cash backing.

200. Beekmeyer's own sworn admission establishes that he possessed actual knowledge of the falsity of this material representation prior to NPFC's execution of the Series E Agreement with NMS.

201. NPFC, NFG, Beekmeyer, and Bye made false representations with the specific intent of inducing NMS to enter into the Series E Agreement and deliver $200M and then $800M for a total of $1 billion in NMS Notes to NPFC, and to accept a Profit Participation Dividend of only five percent (5%) based on the purported "no risk" nature of the transaction.

202. NMS justifiably relied on NPFC's, NFG's Beekmeyer's, and Bye's

misrepresentation of NPFC's then-existing financial condition in deciding to invest in the Series E Preferred Stock, notwithstanding NMS's status as a sophisticated investor, because Beekmeyer declined NMS's offers to obtain independent, Newpoint-specific confirmation of the underlying assets as unnecessary. Likewise, the financial documents provided to NMS were fraudulent.

203. Had NMS known the truth—that the purported Doha Bank cash did not exist—NMS would not have entered into the Series E Agreement or delivered the NMS Notes to NPFC.

204. As a direct and proximate result of NPFC's, NFG's, Beekmeyer's, and Bye's fraudulent inducement, NMS suffered damages separate and apart from any breach of the Series E Agreement itself, including the loss of use of the NMS Notes and the below-market Profit Participation Dividend rate NMS was induced to accept, and potential liability from other transactions with counter parties using the NPFC Notes, in an amount to be determined at trial.

**COUNT VII – CONVERSION**

**(Against NPFC, NFG, Bye and Beekmeyer)**

205. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

206. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

207. As part of the Series E Agreement, Beekmeyer, Bye, NPFC and NFG agreed to escrow into a cash reserve sinking fund an amount equal to four percent (4%) of the notional value of any NPFC Notes issued in any transaction (the "NPFC Note Capital Reserve").

208. The NPFC Note Capital Reserve was intended to create sufficient cash reserves either to replace the NPFC Notes as a later date or to be distributed upon the retirement of the NPFC Note program as additional firm profit.

209. Beekmeyer, Bye, NPFC and NFG failed to segregate 4% per annum of the NPFC Notes deals into a cash reserve account as agreed.

210. Instead, Beekmeyer, Bye, NPFC and NFG exercised unauthorized dominion over the funds by using them for other purposes. Specifically, they improperly used these proceeds to finance overall group operations and for the benefit of NPRE and other affiliates.

211. Beekmeyer and Bye personally directed and controlled the use of NPFC Note proceeds, including by causing NPFC and NFG to divert funds that should have been segregated into the NPFC Note Capital Reserve to instead finance NPRE and other affiliated entities.

212. Beekmeyer and Bye had already caused approximately $100,000,000 of NPFC Note proceeds to be diverted into NPRE as purported solvency and equity capital before NMS even entered into the Series E Agreement, demonstrating a pattern and practice of diverting NPFC Note proceeds—including funds that should have been reserved—for NPRE’s benefit rather than segregating them as required.

213. NPFC, NFG, Bye and Beekmeyer wrongfully converted and appropriated funds and assets that belonged to NMS or should have been held in reserve for NMS's benefit.

214. Between 2021 and 2024, NFG and NPRE used NPFC Notes in transactions totaling more than $1.1 billion, primarily for the benefit of NPRE, generating approximately $700,000,000 in aggregate revenue for NPRE from 2021 through 2024.

215. NPFC and NFG failed to pay NMS its contractual share of these revenues and profits and failed to maintain the NPFC Note Capital Reserve for NMS’s benefit.

216. NPFC’s, NFG’s, Bye’s and Beekmeyer’s conduct in using the NPFC Notes for their own benefit and the benefit of NPRE, while failing to segregate the NPFC Note Capital Reserve and failing to pay NMS its contractual dividends and profit participation, constitutes conversion.

217. As a direct and proximate result of the conversion by NPFC, NFG, Bye and Beekmeyer, NMS has suffered damages including the unpaid profit participation amounts exceeding $4,000,000, the value of the undelivered equity interests, and the loss of the NPFC Note Capital Reserve funds, in an amount to be determined at trial.

**COUNT VIII – UNJUST ENRICHMENT**

**(Against NPRE)**

218. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

219. Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

220. NMS conferred a substantial benefit upon NPRE by delivering $1 billion in NMS Notes to NPFC, which NPFC used to issue NPFC Notes that were, in turn, invested into NPRE as purported solvency and equity capital.

221. NPRE is not a party to the Series E Agreement, the Security Assignment, the MRA, or the Repurchase Agreement, and no contract exists between NMS and NPRE governing NPRE's receipt and retention of the benefit of the NMS Notes.

222. NPRE used the NPFC Notes to build its business, obtain regulatory capital credit, secure external financial strength and credit ratings from AM Best, and generate more than $700,000,000 in revenue from 2021 through 2024.

223. NPRE's balance sheet equity was comprised of approximately 99% NPFC Notes, as against only approximately $1,000,000 of purported paid-in cash capital, a benefit grossly disproportionate to any consideration NPRE itself provided to NMS.

224. NPRE has knowledge and appreciation of the benefit conferred by NMS, including

through its receipt of the share issuances and its use of that capital to obtain the AM Best ratings.

225. Under the circumstances, it would be against equity and good conscience for NPRE to retain the benefit of the NMS Notes without paying NMS the amounts NMS is owed.

226. As a result of NPRE's unjust enrichment, NMS has been damaged in an amount to be proven at trial, including but not limited to the value of the benefit NPRE received and retained through its use of the NPFC Notes.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff NMS Special Opportunity Fund, LP hereby demands judgment in its favor and against Defendants NPFC SPV 1, Inc., NFG SA, Newpoint Reinsurance Company Limited, Keith Beekmeyer, and Andrew Bye as follows:

A. On Count I (Breach of Contract – Series E Agreement), against Defendant NPFC, compensatory damages in an amount to be determined at trial but in excess of $4,355,725.81 (the dividend/profit-participation amounts owed to NMS pursuant to the Series E Agreement), together with pre-judgment and post-judgment interest;

B. On Count II (Breach of Contract – Security Assignment), against Defendant NFG, compensatory damages in an amount to be determined at trial but in excess of $4,355,725.81, together with pre-judgment and post-judgment interest;

C. On Count III (Breach of Contract – Master Repurchase Agreement), against Defendant NPFC, compensatory damages of $110,000,000, together with pre-judgment and post-judgment interest; or, in the alternative, an order compelling NPFC to return the NMS Notes to NMS free and clear of all liens and encumbrances;

D. On Count IV (Breach of Contract – Repurchase Agreement), against Defendants

NPFC and NFG, compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

E. On Count V (Fraud), against Defendants NPFC, NFG, Beekmeyer, and Bye, compensatory damages in an amount to be determined at trial, together with punitive damages in an amount sufficient to punish Defendants' knowing and fraudulent conduct and to deter similar conduct in the future;

F. On Count VI (Fraudulent Inducement), against Defendants NPFC, NFG, Beekmeyer, and Bye, compensatory damages in an amount to be determined at trial, together with punitive damages;

G. On Count VII (Conversion), against Defendants NPFC, NFG, Bye and Beekmeyer, compensatory damages in an amount to be determined at trial, including the value of the misappropriated NPFC Note Capital Reserve funds and unpaid profit participation amounts, together with an accounting of all funds and assets converted;

H. On Count VIII (Unjust Enrichment), against Defendant NPRE, restitution and/or disgorgement of all benefits wrongfully retained, in an amount to be determined at trial;

I. An order directing Defendants to provide a full and complete accounting of all transactions involving the NPFC Notes, the NPFC Note Capital Reserve, and all equity interests acquired using the NPFC Notes;

J. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

K. An award of Plaintiff’s costs and reasonable attorney’s fees; and

L. For such other and further relief as this Court deems just and proper.

DATED: September 4, 2026

FROST LLP

By:______________________________

Gregory Thomson
Christopher Frost *(Pro Hac Vice Forthcoming)*

Catherine Liu *(Pro Hac Vice Forthcoming)*
FROST LLP

10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
424-254-0441
chris@frostllp.com
catherine@frostllp.com

*Attorneys for Plaintiff*