# EXHIBIT B

NPFC-NMS Convertible Redeemable
Stock Purchase Agreement

# CONVERTIBLE REDEEMABLE PREFERRED STOCK PURCHASE AGREEMENT

**Between**

**Newpoint Financial Corp**

**and**

**NMS Special Opportunity Fund, LP**

**Date: July 19, 2021**

---

---

THIS CONVERTIBLE REDEEMABLE PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 16, 2021, between Newpoint Financial Corp, a corporation organized and existing under the laws of the State of Wyoming, registered at 30 N Gould Street, Sheridan, Wyoming, 82801(the "Company"), and NMS Special Opportunity Fund, LP, a corporation organized and existing under the laws of the State of Delaware, registered at 433 North Camden Drive, Suite 725, Beverly Hills CA 90220 (the "Purchaser").

WHEREAS, subject to the terms and conditions set forth in this Agreement, the Company desires to issue and sell to the Purchaser and the Purchaser desires to acquire from the Company two thousand (2,000) shares of the Company's Series E Convertible Redeemable Preferred Stock, (the "Series E Preferred Stock"), with a Stated Value of one hundred thousand dollars ($100,000.00) per share, which is part of a sale of Series E Preferred Stock with an aggregate Stated Value of two hundred million dollars ($200,000,000.00).

IN CONSIDERATION of the mutual covenants contained in this Agreement, the Company and each Purchaser agree as follows:

## SECTION I

## CERTAIN DEFINITIONS

1.1 Certain Definitions. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"Affiliate" means, with respect to any Person, any Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Articles of Amendment" means the Amendment of the Company's Articles of Incorporation that authorizes the Series E Preferred Stock annexed as **Exhibit A** hereto.

"Business Day" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other government actions to close.

"Change of Control" means the acquisition, directly or indirectly, by any Person of ownership of, or the power to direct the exercise of voting power with respect to, a majority of the issued and outstanding voting securities of the Company.

"Closing" shall have the meaning set forth in Section 2.2(a).

"Closing Date" shall have the meaning set forth in Section 2.2(a).

"Common Stock" means shares now or hereafter authorized of the class of common stock, no par value, of the Company and stock of any other class into which such shares may hereafter have been reclassified or changed.

"Company" shall have the meaning set forth in the introductory paragraph.

"Control Person" shall have the meaning set forth in Section 4.7 (a) hereof.

"Conversion Date" shall have the meaning set forth in the Articles of Amendment.

"Conversion Price" shall have the meaning set forth in the Articles of Amendment.

"Default" means any event or condition which constitutes an Event of Default or which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosure Documents" means the documents and materials set forth on **Schedule 1.1** hereto provided to the Purchaser and/or its representatives in connection with the Company and this offering.

"Event of Default" shall have the meaning set forth in Section 5.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Indemnified Party" shall have the meaning set forth in Section 4.7(b) hereof.

"Indemnifying Party" shall have the meaning set forth in Section 4.7(b) hereof.
"Losses" shall have the meaning set forth in Section 4.7(a) hereof.

"Material" shall mean having a financial consequence in excess of $25,000.

"Person" means an individual or a corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Purchase Price" shall have the meaning set forth in Section 2.1(b).

"Purchaser" shall have the meaning set forth in the introductory paragraph.

"Redemption Price" shall mean an amount equal to the Stated Value of the Shares outstanding that are subject to redemption.

"Reporting Issuer" means a company that is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

"Required Approvals" shall have the meaning set forth in Section 3.1(f).

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Series E Preferred Stock" shall have the meaning set forth in the recital.

"Shares" shall have the meaning set forth in Section 2.1(a).

"Stated Value" means the sum of One Hundred Thousand Dollars($100,000.00) per Share or Two Hundred Million Dollars ($200,000,000.00) for all of the Shares.

"Transaction Documents" means this Agreement and all exhibits and schedules hereto and all other documents, instruments and writings required pursuant to this Agreement.

**SECTION II**

**PURCHASE AND SALE OF CONVERTIBLE PREFERRED SHARES**

2.1 Purchase and Sale; Purchase Price.

(a) Subject to the terms and conditions set forth herein, the Company shall issue and sell and the Purchaser shall purchase 2,000 shares of the Company's Series E Preferred Stock (the "Shares"). The Series E Preferred Stock shall have the respective rights, preferences and privileges as set forth in the Articles of Amendment to be filed by the Company with the Secretary of State of Wyoming prior to the 30.09.2021 and/or a date to be agreed.

(b) The purchase price for each Share shall be One Hundred Thousand Dollars ($100,000.00) (the "Per Share Consideration"). The Per Share Consideration multiplied by the number of Shares to be purchased by the Purchaser is referred to as the "Purchase Price."

(c) Consideration for the Purchase Price of the Shares shall be a perfected Senior Secured Notes totalling a minimum of $200,000,000. The Senior Secured Note shall be subject to a perfected UCC-1 filing that reference's NMS UCC-1 in which its interest over the Collateral was perfected (the "UCC Filing"). A true and correct copy of the Senior Secured Note is attached hereto as **Exhibit B** hereto.

2.2 Execution and Delivery of Documents; The Closing.

(a) The Closing of the purchase and sale of the Shares (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement (the "Closing Date"). No later than July 21, 2021.

(i) The Company shall execute and deliver to the Purchaser the certificates representing the Shares, which Shares shall have the respective rights, preferences and privileges as set forth in the Articles of Amendment annexed as **Exhibit A** hereto; and

## SECTION III

## REPRESENTATIONS AND WARRANTIES

3.1 Representations, Warranties and Agreements of the Company. The Company hereby makes the following representations and warranties to the Purchaser as of the date of this Agreement, all of which shall survive the Closing:

(a) Organization and Qualification. The Company is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Wyoming, with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Company is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, would not, individually or in the aggregate, have a material adverse effect on the results of operations, assets, prospects, or financial condition of the Company taken as a whole (a "Material Adverse Effect").

(b) Authorization, Enforcement. The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated hereby and by each other Transaction Document and to otherwise carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the other Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby has been duly authorized by all necessary action on the part of the Company. Each of this Agreement and each of the other Transaction Documents has been or will be duly executed by the Company and when delivered in accordance with the terms hereof or thereof will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

(c) Capitalization. The authorized, issued and outstanding capital stock of the Company is set forth on **Schedule 3.1(c)**. No shares of the Series E Preferred Stock have been issued as of the date hereof. No shares of Common Stock or any other class of the Company's securities are entitled to preemptive or similar rights, nor is any holder of the Common Stock entitled to preemptive or similar rights arising out of any agreement or understanding with the Company by virtue of this Agreement.

(d) Issuance of Securities. The Shares have been duly and validly authorized for issuance, offer and sale pursuant to this Agreement and, when issued and delivered as provided hereunder against payment in accordance with the terms hereof, shall be valid and binding obligations of the Company enforceable in accordance with their respective terms.

(e) No Conflicts. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of its Articles of Incorporation or

bylaws (each as amended through the date hereof) or (ii) be subject to obtaining any consents except those referred to in Section 3.1(f), conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or its Subsidiaries is subject (including, but not limited to, those of other countries and the federal and state securities laws and regulations), or by which any property or asset of the Company is bound or affected, except in the case of clauses (ii) or (iii), such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect. The business of the Company is not being conducted in violation of any law, ordinance or regulation of any governmental authority, the result of which would, individually or in the aggregate, have a Material Adverse Effect.

(f) Consents and Approvals. Except as specifically set forth in **Schedule 3.1(f)**, neither the Company nor any Subsidiary is required to obtain any consent, waiver, authorization or order of, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person, in connection with the execution, delivery and performance by the Company of this Agreement and each of the other Transaction Documents, except for the filing of the Articles of Amendment with respect to the Series E Preferred Stock, which filing will be made with the Secretary of State of the State of Wyoming and if applicable, the filing of an 8K Notice with the Securities and Exchange Commission prior to the 30.09.2021 and/or a date to be agreed (together with the consents, waivers, authorizations, orders, notices and filings referred to in **Schedule 3.1(f)**, the "Required Approvals").

(g) Litigation; Proceedings. Except as specifically disclosed in **Schedule 3.1(g)**, there is no action, suit, notice of violation, proceeding or investigation pending or, to the best knowledge of the Company, threatened against or affecting the Company or its their respective properties before or by any court, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) which (i) relates to or challenges the legality, validity or enforceability of any of the Transaction Documents or the Shares, (ii) could, individually or in the aggregate, have a Material Adverse Effect or (iii) could, individually or in the aggregate, materially impair the ability of the Company to perform fully on a timely basis its obligations under the Transaction Documents.

(h) No Default or Violation. Except as set forth in **Schedule 3.1(h)** hereto, the Company n (i) is not in default under or in violation of any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound, except such conflicts or defaults as do not have a Material Adverse Effect, (ii) is in violation of any order of any court, arbitrator or governmental body, except for such violations as do not have a Material Adverse Effect, or (iii) is in violation of any statute, rule or regulation of any governmental authority which could (individually or in the aggregate) (x) adversely affect the legality, validity or enforceability of this Agreement, (y) have a Material Adverse Effect, or (z) adversely impair the Company's ability or obligation to perform fully on a timely basis its obligations under this Agreement.

(i) Disclosure Documents. The Disclosure Documents are accurate in all material respects and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(j) Non-Registered Offering. Neither the Company nor any Person acting on its behalf has taken or will take any action (including, without limitation, any offering of any securities of the Company under circumstances which would require the integration of such offering with the offering of the Securities under the Securities Act) which might subject the offering, issuance or sale of the Shares to the registration requirements of Section 5 of the Securities Act.

(k) Fees.

(i) Total payment of USD $100,000 per annum as annual fixed dividend.

(ii) At closing, Newpoint Financial Corp shall pay an advance payment of $50,000 ("Advance 1") after ninety-days (90) days of Closing, an additional advance payment of $50,000 ("Advance 2").

(ii) In subsequent years, payments are to be paid quarterly in arrears until expiry.

(iii) Profit Commission. In addition to the Coupon Payment Amount, Newpoint Financial Corp agrees to pay NMS a commission equal to 5% of the Ultimate Net underwriting profits (profits being defined as gross premium less Outward Reinsurance Premium, Acquisition Cost, Commission, Claims Reserve, IBNR, Management, Local Taxes, Survey Fees and Expenses as discussed) based on audited accounts duly signed off, payable three months after signed accounts, based on a decreasing percentage relating to the retirement of the Senior Secured Note.

3.2 Representations and Warranties of the Purchaser. The Purchaser hereby represents and warrants to the Company as follows:

(a) Authority. The Purchaser has the requisite power and authority to enter into and to consummate the transactions contemplated hereby and by the other Transaction Documents and to otherwise carry out his obligations hereunder and thereunder. The execution and delivery of this Agreement and the acquisition of the Shares by the Purchaser (i) have been duly authorized by all necessary action on the part of the Purchaser, and (ii) in cases where Purchaser is not an individual, such execution, delivery and acquisition will not violate the provisions of the organizational documents of Purchaser or any agreement, obligation, law, rule, regulation or order to which Purchaser is a party or by which it is bound. This Agreement has been duly executed and delivered by the Purchaser and constitutes the valid and legally binding obligation of the Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to, or affecting generally the enforcement of, creditors rights and remedies or by other general principles of equity.

(b) Investment Intent. The Purchaser (i) is acquiring the Shares to be purchased hereunder, and will acquire the Shares for its own account for investment purposes only and not with a view to or for distributing or reselling such Shares, or any part thereof or interest therein, without prejudice, however, to such Purchaser's right, subject to the provisions of this Agreement, at all times to sell or otherwise dispose of all or any part of such Shares pursuant to a registration under federal and applicable state securities laws, or an exemption therefrom based on an opinion of legal counsel acceptable to the Company that an exemption is available; and (ii) has not attempted to sell or offered for sale any of the Shares. The Purchaser is not purchasing the Shares with the funds of any other Person nor acting as an underwriter or a conduit for the sale of the Shares to the public or to others. The Purchaser is not a member of the National Association of Securities Dealers, Inc. ("NASD") and for a period of 12 months prior to the date of this Agreement, has not been affiliated or associated with any company, firm, or other entity that is a member of the NASD.

(c) Experience of Purchaser. The Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of an investment in the Shares to be acquired by Purchaser hereunder, and has obtained, in its own judgment, sufficient information from the Company to evaluate such merits and risks.

(d) Ability of Purchaser to Bear Risk of Investment. The Purchaser understands that there is no assurance as to the viability or future performance of the Company. The Purchaser recognizes that an investment in the Shares is speculative and involves a high degree of risk including, but not limited to, the risk of economic losses from operations of the Company and the potential loss of investment. The Purchaser understands that no market for the Shares exists and none may develop in the future. The Purchaser is able to bear the economic risk of an investment in the Shares to be acquired by him or her hereunder and, at the pre-sent time, is able to afford a complete loss of such investment.

(e) Access to Information. The Purchaser acknowledges that he has been afforded (i) the opportunity to ask such questions as Purchaser has deemed necessary of, and to receive answers from, representatives of the Company concerning the terms and conditions of the Shares offered hereunder; (ii) access to information about the Company and the Company's financial condition, results of operations, business, properties, management and prospects sufficient to enable Purchaser to evaluate an investment in the Shares; and (iii) the opportunity to obtain such additional information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to make an informed investment decision with respect to the investment and to verify the accuracy and completeness of the information that Purchaser has received about the Company. The Purchaser represents that all of his questions concerning the Company and the Shares have been answered to its full satisfaction.

(f) Investment Decision. Except for the Disclosure Documents, the Purchaser has not received or relied on any representation or warranty from the Company or any of its officers, directors, employees, agents, attorneys or other representatives in respect of Purchaser's investment in the Shares, and has relied upon its own investigation in evaluating the risks and merits of making a decision to purchase the Shares. The Purchaser has had the opportunity to discuss the consequences of his investment decision with his legal and tax advisors. Without limiting the generality of the foregoing, and notwithstanding any other representation or warranty made by the Company, Purchaser acknowledges that the Company has not made any representation or warranty with respect to any projections, estimates, or budgets of future revenues, expenses, or expenditures or future results of operations.

(g) Transferability of Shares. Purchaser acknowledges that the transferability of the Shares is severely limited and that the Purchaser must continue to bear the economic risk of this investment for an indefinite period as these Securities have not been registered under the Securities Act of 1933, as amended, or any state securities law in reliance on an exemption therefrom for transactions not involving a public offering and, therefore, cannot be offered or sold without an effective registration statement for such Shares under the Securities Act of 1933, as amended, and applicable state securities laws or an opinion of counsel for the Corporation that registration is not required under the Securities Act of 1933, as amended, and applicable state securities laws. Further, the Purchaser acknowledges that the Purchaser has no right to compel registration and the Company has no intention of registering the Securities or to take the action required to make Rule 144 under the Securities Act of 1933, as amended, available for resale of the Shares.

(h) Legend on Shares. The Purchaser acknowledges that a restrictive legend will be placed on the certificate for the Shares, substantially in the following form:

"The shares represented by this certificate have not been registered under the federal Securities Act of 1933, as amended, or the securities law of any state. These shares may not be sold or offered for sale unless they have first been so registered or unless the Company receives a written opinion from legal counsel acceptable to the Company that such registration is not required."

(i) Reliance. The Purchaser understands and acknowledges that (i) the Shares being offered and sold to Purchaser hereunder are being offered and sold without registration under the Securities Act in a private placement that is exempt from the registration provisions of the Securities Act under Rule 506 of Regulation D and without registration under the securities laws of any states, and (ii) the availability of such exemption depends in part on, and that the Company will rely upon the accuracy and truthfulness of, the representations made by Purchaser in this Agreement as well as any additional information that Purchaser has furnished regarding his or her own financial position, business experience or any matters, and such Purchaser hereby consents to such reliance.

The Company acknowledges and agrees that the Purchaser makes no representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in this Section 3.2.

## SECTION IV

## OTHER AGREEMENTS OF THE PARTIES

4.1 Manner of Offering. The Shares are being issued pursuant to Rule 506 of Regulation D of the Securities Act.

4.2 Notice of Certain Events. The Company shall, on a continuing basis prior to Closing, advise the Purchaser promptly after obtaining knowledge of, and, if requested by the Purchaser, confirm such advice in writing, of any event that makes any statement of a material fact made by the Company in Section 3.1 or in the Disclosure Documents untrue or that requires the making of any additions to or changes in Section 3.1 or in the Disclosure Documents in order to make the statements therein, in the light of the circumstances under which they are made, not misleading.

4.3 Modification to Disclosure Documents. If any event shall occur prior to Closing as a result of which, in the reasonable judgment of the Company or the Purchaser, it becomes necessary or advisable to amend or supplement any of the Disclosure Documents in order to make the statements therein, in the light of the circumstances at the time such Disclosure Documents were delivered to the Purchaser, not misleading, or if it becomes necessary to amend or supplement any of the Disclosure Documents to comply with applicable law, the Company shall promptly prepare an appropriate amendment or supplement to each such document in form and substance reasonably satisfactory to both the Purchaser and Company so that, as so amended or supplemented, each such document will not include an untrue statement of material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time it is delivered to the Purchaser, not misleading.

4.4 Blue Sky Laws. The Company shall cooperate with the Purchaser in connection with the exemption from registration of the Shares under the securities or Blue Sky laws of such jurisdictions as the Purchasers may request; provided, however, that the Company shall not be required in connection therewith to qualify as a foreign corporation where they are not now so qualified. The Company agrees that it will execute all necessary documents and pay all necessary state filing or notice fees to enable the Company to qualify for an exemption from registration of the Shares and sell the Shares to the Purchasers.

4.5 Integration. The Company shall not and shall use its best efforts to ensure that no Affiliate shall sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Shares in a manner that would require the registration under the Securities Act of the sale of the Shares to the Purchaser.

4.6 Solicitation Materials. The Company shall not (i) distribute any offering materials in connection with the offering and sale of the Shares other than the Disclosure Documents and any amendments and supplements thereto prepared in compliance herewith or (ii) solicit any offer to buy or sell the Shares by means of any form of general solicitation or advertising.

4.7 Indemnification.

(a) Indemnification

(i) The Company shall, notwithstanding termination of this Agreement and without limitation as to time, indemnify and hold harmless the Purchaser and its officers, directors, agents, employees and affiliates, each Person who controls the Purchaser (within the meaning of Section 15 of the Securities Act or Section 20 of the

Exchange Act) (each such Person, a "Control Person") and the officers, directors, agents, employees and affiliates of each such Control Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of, or relating to, a breach or breaches of any representation, warranty, covenant or agreement by the Company under this Agreement or any other Transaction Document.

(ii) The Purchaser shall, notwithstanding termination of this Agreement and without limitation as to time, indemnify and hold harmless the Company, its officers, directors, agents and employees, each Control Person and the officers, directors, agents and employees of each Control Person, to the fullest extent permitted by application law, from and against any and all Losses, as incurred, arising out of, or relating to, a breach or breaches of any representation, warranty, covenant or agreement by the Purchaser under this Agreement or the other Transaction Documents.

(b) Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party promptly shall notify the Person from whom indemnity is sought (the "Indemnifying Party") in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have proximately and materially adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed to pay such fees and expenses; or (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that a conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of the claim against the Indemnified Party but will retain the right to control the overall Proceedings out of which the claim arose and such counsel employed by the Indemnified Party shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

All fees and expenses of the Indemnified Party to which the Indemnified Party is entitled hereunder (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section) shall be paid to the Indemnified Party, as incurred, within ten (10) Business Days of written notice thereof to the Indemnifying Party.

No right of indemnification under this Section shall be available as to a particular Indemnified Party if there is a non-appealable final judicial determination that such Losses arise solely out of the negligence or bad faith of such Indemnified Party in performing the obligations of such Indemnified Party under this Agreement or a breach by such Indemnified Party of its obligations under this Agreement.

(c) Non-Exclusivity. The indemnity and contribution agreements contained in this Section are in addition to any obligation or liability that the Indemnifying Parties may have to the Indemnified Parties.



KB

4.8 No Violation of Applicable Law. Notwithstanding any provision of this Agreement to the contrary, if the redemption of the Shares otherwise required under this Agreement or the Articles of Amendment, would be prohibited by the relevant provisions of Delaware law, such redemption shall be effected as soon as it is permitted under such law.

4.9 Redemption Restrictions. Notwithstanding any provision of this Agreement to the contrary, if any redemption of the Shares otherwise required under this Agreement or the Articles of Amendment, would be prohibited in the absence of consent from any lender to the Company, or by the holders of any class of securities of the Company, the Company shall use its best efforts to obtain such consent as promptly as practicable after any such redemption is required. Nothing contained in this Section 4.9 shall be construed as a waiver by the Purchaser of any rights they may have by virtue of any breach of any representation or warranty of the Company herein as to the absence of any requirement to obtain any such consent.

4.10. Redemption Rights. Ten (10) years after the Closing, at the request of the holders of the then outstanding Series E Convertible Redeemable Preferred Shares, NPFC will redeem them at a redemption price equal to the Purchase Price.

4.11 Conversion Procedures. The Articles of Amendment sets forth the procedures, including the forms of Notice of Conversion to be provided upon conversion and such other information and instructions as may be reasonably necessary to enable the Purchaser or its permitted transferee(s) to exercise the right of conversion smoothly and expeditiously.

## SECTION V

## EVENT OF DEFAULT, LEGAL FEES AND DEFAULT INTEREST RATE

(a) In the event any party hereto commences legal action to enforce its rights under this Agreement or any other Transaction Document, the non-prevailing party shall pay all reasonable costs and expenses (including but not limited to reasonable attorney's fees, accountant's fees, appraiser's fees and investigative fees) incurred by the other party in enforcing such rights. In the event of an uncured Event of Default by any party hereunder, interest shall accrue on all unpaid amounts due the aggrieved party at the rate of ten percent (10%) per annum, compounded annually.

(b) Whenever the Company is obligated to purchase or redeem the Purchaser's Shares under any provision of this Agreement or the Articles of Amendment, and the Redemption Price is not paid to the Purchaser by the tenth (10th) day after the Redemption Price is due and payable to the Purchaser, the Company shall thereafter pay interest to the Purchaser on the unpaid portion of the Redemption Price at the rate of ten percent (10%) per annum, until the Redemption Price is paid in full.

(c) "Event of Default", wherever used herein, means the occurrence of any one of the following events:

(i) the Company shall fail to observe or perform any material covenant, agreement or warranty contained in Articles of Amendment, and such failure shall not have been remedied within ten (10) Business Days after the date on which written notice of such failure shall have been given by Purchaser;

(ii) the occurrence of any material breach or event of default by the Company under the Purchase Agreement or any other Transaction Document (as defined in the Purchase Agreement) and such failure or breach shall not have been remedied within the applicable cure period provided for therein, if any;

(iii) the Company shall commence a voluntary case under the United States Bankruptcy Code as now or hereafter in effect or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced

against the Company under the Bankruptcy Code and the Company fails to pursue dismissal of the case within sixty (60) days after commencement of the case; or the Company commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Company or there is commenced against the Company any such proceeding and the Company fails to pursue dismissal of the case within sixty (60) days after commencement of the case; or the Company suffers any appointment of any custodian or the like for it or any substantial part of its property and the Company fails to pursue dismissal of the custodian within sixty (60) days after the appointment; or the Company makes a general assignment for the benefit of creditors; or any corporate or other action is taken by the Company for the purpose of effecting any of the foregoing.

(iv) The Company fails to pay any Fees described in 3.1(k) herein when due following 90 days from demand for payment. Interest will accrue at the rate of 18% per year on the amount due after 30 days from payment demand.

(d) In the event of an uncured Event of Default, holders of Series E Stock shall have the right to automatically force the redemption of the Series E Stock at a redemption price equal to the Purchase Price by triggering of the Master Repurchase Agreement. NPFC shall deliver the NMS Senior Secured Notes as payment free of any encumbrance or lien.

## SECTION VI

## MISCELLANEOUS

6.1 Fees and Expenses. Except as set forth in this Agreement, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all stamp and other taxes and duties levied in connection with the issuance of the Shares pursuant hereto. The Purchaser shall be responsible for any taxes payable by the Purchaser that may arise as a result of the investment hereunder or the transactions contemplated by this Agreement or any other Transaction Document. The Company shall pay all costs, expenses, fees and all taxes incident to and in connection with: (A) the issuance and delivery of the Shares, (B) the exemption from registration of the Shares for offer and sale to the Purchaser under the securities or Blue Sky laws of the applicable jurisdictions, and (C) the preparation of certificates for the Shares (including, without limitation, printing and engraving thereof), and (D) all fees and expenses of counsel and accountants of the Company.

6.2 Entire Agreement. This Agreement, together with all of the Exhibits and Schedules annexed hereto, and any other Transaction Document contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters. This Agreement shall be deemed to have been drafted and negotiated by both parties hereto and no presumptions as to interpretation, construction or enforceability shall be made by or against either party in such regard.

6.3 Notices. Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given upon facsimile transmission (with written transmission confirmation report) at the number designated below (if delivered on a Business Day during normal business hours where such notice is to be received), or the first Business Day following such delivery (if delivered other than on a Business Day during normal business hours where such notice is to be received) whichever shall first occur. The addresses for such communications shall be:

If to the Company: Newpoint Financial Corp.
100 Pearl Street
Hartford, CT 06103

Attn: Thi A.H. Nguyen

| | |
|---|---|
| | CLO@newpointfinancialcorp.com<br>Tel: 323-628-8829 |
| With copies to: | Newpoint Financial (Europe) Limited<br>8th Floor<br>17 Bevis Marks<br>London, EC3A 7LN<br><br>Attn: Constantine Harker<br>E: Constantine.Harker@newpointeurope.com<br>Tel: 02039833303 |
| If to the Purchaser | NMS Special Opportunity Fund LP<br>433 N. Camden Drive, Suite 725<br>Beverly Hills, CA 90210<br><br>Attn: Legal Dep.<br>E: info@nmscg.com<br>Tel: +1 310 855 0020 |
| With copies to: | NMS Capital Management GP, LLC<br>433 N. Camden Drive, Suite 725<br>Beverly Hills, CA 90210<br><br>Attn: Trevor M. Saliba<br>E: Trevor.saliba@nmscg.com<br>Tel: +1 424 317 5111 |

or such other address as may be designated hereafter by notice given pursuant to the terms of this Section 6.3.

6.4 Amendments; Waivers. No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by both the Company and the Purchaser, or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

6.5 Headings. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

6.6 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. The assignment by a party of this Agreement or any rights hereunder shall not affect the obligations of such party under this Agreement.



TS

6.7 No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

6.8 Governing Law; Venue; Service of Process. The parties hereto acknowledge that the transactions contemplated by this Agreement and the exhibits hereto bear a reasonable relation to the State of Delaware. The parties hereto agree that the internal laws of the State of Delaware shall govern this Agreement and the exhibits hereto, including, but not limited to, all issues related to usury.

6.9 Survival. The representations and warranties of the Company and the Purchaser contained in Section III and the agreements and covenants of the parties contained in Section IV and this Section VI shall survive the Closing.

6.10 Counterpart Signatures. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

6.11 Severability. In case any one or more of the provisions of this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute therefore, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

6.12 Limitation of Remedies. Notwithstanding anything to the contrary contained in this Agreement, with respect to claims by the Company or any person acting by or through the Company, or by the Purchaser or any person acting through the Purchaser, for remedies at law or at equity relating to or arising out of a breach of this Agreement, liability, if any, shall, in no event, include loss of profits or incidental, indirect, exemplary, punitive, special or consequential damages of any kind.

[ *SIGNATURE PAGE FOLLOWS* ]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first indicated above.

Company:

Newpoint Financial Corp

NEWPOINT FINANCIAL CORP

By: ________________

Name: KEITH DAVID BEEKMEYER

Title: CEO

Purchaser:
NMS Special Opportunity Fund, LP

By: NMS Capital Management GP, LLC as general partner of NMS Special Opportunity Fund, LP

By: ________________

Name: Trevor M. Saliba

Title: Managing Director

**Exhibit A**

**ARTICLES OF AMENDMENT**
**TO THE ARTICLES OF INCORPORATION**
**OF**
**NEWPOINT FINANCIAL CORP**

1. **NAME**. The name of the corporation is NEWPOINT FINANCIAL CORP (the "Corporation").

2. **TEXT OF AMENDMENT.** Article __ of the Articles of Incorporation of the Corporation is hereby amended and restated in its entirety to read as follows:

ARTICLE VI
Authorized Shares of Stock

Section 1. Number of Shares. The Corporation is authorized to issue a total of 502,000 shares of stock, divided into the following classes: (a) 500,000 shares of Common Stock, with no par value; and (b) 2,000 shares of Series E Convertible Redeemable Preferred Stock.

Section 2. Terms of Common Stock. The Common Stock shall have the following rights, restrictions, limitations and preferences:

(a). No Preference. None of the shares of Common Stock shall be entitled to any preference, and each share of Common Stock shall be equal to every other share of Common Stock in every respect.

(b). Dividends. After payment or declaration of all dividends on any shares having a priority over the Common Stock as to dividends, dividends on the shares of Common Stock may be declared and paid, but only when and as determined by the Board of Directors. Shares of Common Stock shall share equally as to any dividends declared.

(c). Rights on Liquidation. On any liquidation, dissolution or winding up of the Corporation, after there shall have paid to or set aside for the holders of any shares having priority over the Common Stock the full preferential amounts, if any, to which they are respectively entitled, the holders of the Common Stock shall be entitled to receive pro rata all the remaining assets of the Corporation available for distribution to holders of its capital stock in accordance with Section 4(f)(ii).

(d). Voting. Each shareholder of Common Stock shall have the right to one (1) vote for each share of Common Stock standing in his or her name on the books of the Corporation on each matter submitted to a vote at any meeting of the shareholders.

(e) Board of Directors. The Purchaser shall have the right to appoint one (1) person as a member of the Board of Directors ("Board") and one (1) person as a member of any Credit Committee ("Credit Committee"), and one (1) person with monitoring rights. The Purchaser's designated Board representative shall have veto power over any Board of Director action where the Senior Secured Notes are being used in any manner that puts them at risk regard of the number of members to the Board votes. The Purchase shall provide its designated representative(s) by providing written notice to the Board and shall be required to all provide prior written notice in the event of any changes to the Purchaser's designated representative(s).

Section 3. Terms of Preferred Stock. The Preferred Stock authorized by these Articles of Incorporation ("Articles") may be issued from time to time in one or more series. Two Thousand (2,000) shares of the

Preferred Stock shall be designated as Series E Convertible Redeemable Preferred Stock (the "Series E Preferred Stock") and the stated value of the Series E Preferred Stock shall be U.S. $100,000.00 per share (the "Stated Value"). The rights, preferences, privileges and restrictions granted to and imposed on the Series E Preferred Stock are set forth in Section 4 of this Article VI. Subject to compliance with any applicable protective voting rights that have been or may be granted to the Preferred Stock or series thereof in these Articles, as the same may be amended from time to time ("Protective Provisions"), the Board of Directors is authorized to provide for the issuance of additional shares of Preferred Stock in series by filing an amendment to the Articles pursuant to the applicable law, to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each such series End the qualifications, limitations or restrictions thereof.

Section 4. Terms of Series E Preferred Stock. The Series E Preferred Stock shall have the rights, restrictions, limitations and preferences set forth in this Section 4.

(a). Certain Definitions. For purposes of this Section 4, the following terms have the meanings specified or referred to in this Section 4(a):

(i). *"Change of Control"* means the acquisition, directly or indirectly, by any Person of ownership of, or the power to direct the exercise of voting power with respect to, a majority of the issued and outstanding Common Stock of the Corporation.

(ii). *"Issuance Date"* means the date of the Closing under the Convertible Preferred Stock Purchase Agreement with respect to the initial issuance of the Series E Preferred Stock.

(iii). *"Person"* means an individual or a corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind.

(iv). *"Purchase Agreement"* means the Convertible Redeemable Preferred Stock Purchase Agreement dated (TBA), by and between the Corporation and the purchasers set forth in Schedule I thereto (the "Purchaser").

(b) Dividend Payment Schedule. For the first year after the issuance NPFC shall pay an advance payment of $50,000 ("Advance 1) and after 90 days of closing, an additional advance payment of $50,000 ("Advance 2"). After the first year dividends will be paid quarterly in arrears until expiry.

(c) Profit Commission. In addition to the Coupon Payment Amount, Newpoint Financial Corp agrees to pay NMS a commission equal to 5% of the Ultimate Net underwriting profits (profits being defined as gross premium less Outward Reinsurance Premium, Acquisition Cost, Commission, Claims Reserve, IBNR, Management, Local Taxes, Survey Fees and Expenses as discussed) based on audited accounts duly signed off, payable three months after signed accounts, based on a decreasing percentage relating to the retirement of the Senior Secured Note.

(i) General Professional Indemnity Limited- The $200m allocation document amend being prepared to support GPIL needs to references as GPIL as follows- "General Professional Indemnity Limited, in the

name and on behalf of NPSLA2018-01". This is a Master Account setup for Newpoint Capital back in 2018 held within GPIL.

This Commission shall be recorded in the Resolutions of each entity and steps shall be taken to effectuate the goal of this paragraph. This Commission shall not be affected by the redemption of any Shares or cancellation of any Senior Secured Notes except as provided in Section 4(c).

(d). Conversion.

(i). Each holder of the Series E Preferred Shares will have the right, at the option of the Corporation, commencing ten (10) years after the closing of the sale of the Series E Preferred Shares to convert the Series E Preferred Shares into Series B common shares with no voting rights at an initial strike price of $100.00 USD ("Conversion Price"). The Conversion Price shall be subject to an adjustment to prevent dilution in the event the Corporation issues additional shares of capital stock (with the exception of common stock issued to employees, consultants, officers or directors pursuant to stock purchase or stock option plans or agreements approved by the Board of Directors, including any options granted prior to the Closing of the Series E Preferred Stock) at a purchase price less than the Conversion Price. In such an event the Conversion Price shall bed adjusted to a weighted average formula.

(ii). The Holder shall effect conversion by sending the form of conversion notice attached hereto as Appendix I (the "Notice of Conversion"). If required by the Corporation, certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her, or its attorney duly authorized in writing. The Corporation, as soon as practicable after the Conversion Date, shall cause to be issued and delivered at such office to such Holder, a certificate or certificates for the number of shares of Series B common shares to which such Holder shall be entitled. No fractional shares of Series B common shares shall be issuable upon a conversion hereunder and the number of shares to be issued shall be rounded up to the nearest whole share. If a fractional share interest arises upon any conversion hereunder, the Corporation shall cause the elimination of such fractional share interest by causing to be issued to Holder an additional full share of Series B common shares.

Not later than ten (10) business days after the Corporation's receipt of the Notice of Conversion, the Corporation will deliver to the Holder a certificate or certificates representing the number of shares of Series B common shares being acquired upon the conversion of the Series E Preferred Stock provided, however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Series B common shares issuable upon conversion of any Series E Preferred Share until the shares or the Series E Preferred Shares are either delivered for conversion to the Corporation or any transfer agent for the Series E Preferred Stock, or the Holder notifies the Corporation that such Series E Preferred Stock have been lost, stolen or destroyed and provides an agreement reasonably acceptable to the Corporation to indemnify the Corporation from any loss incurred by it in connection therewith.

(iii). If at any time conditions shall arise by reason of action or inaction taken by the Corporation which in the opinion of the Board of Directors are not adequately covered by the other provisions hereof and which might materially and adversely affect the rights of the Holders of Series E Preferred Shares (different than or distinguished from the effect generally on rights of holders of any class of the Corporation's capital stock), the Corporation shall, at least thirty (30) calendar days prior to the effective date of such action, mail a written notice to each Holder of Series E Preferred Shares briefly describing the action contemplated and the material adverse effects of such action on the rights of such Holders, and an appraiser selected by the Holders of majority of the outstanding Series E Preferred Shares shall give its opinion as to the adjustment, if any (not inconsistent with the standards established in this Article VI), of the Conversion Price (including, if necessary, any adjustment as to the securities into which Series E Preferred Stock may thereafter be convertible) and any distribution which is or would be required to

preserve, without diluting, the rights of the Holders of Series E Preferred Shares; provided, however, that the Corporation, after receipt of the determination by such appraiser, shall have the right to select an additional appraiser, in which case the adjustment shall be equal to the average of the adjustments recommended by each such appraiser. The Board of Directors shall make the adjustment recommended forthwith upon the receipt of such opinion or opinions or the taking of any such action contemplated, as the case may be; provided, however, that no such adjustment of the Conversion Price shall be made which in the opinion of the appraiser(s) giving the aforesaid opinion or opinions would result in an increase of the Conversion Price.

(v). The Corporation covenants that it will reserve and keep available out of the authorized and unissued Series B common shares, solely for the purpose of issuance upon conversion of Series E Preferred Stock as herein provided, free from preemptive rights or any other actual contingent purchase rights of persons other than the Holders of Series E Preferred Stock, such number of shares of Series B common shares as shall be issuable upon the conversion of the aggregate Stated Value of all outstanding Series E Preferred Stock. The Corporation covenants that all shares of Series B common shares that shall be so issuable shall, upon issue, be duly and validly authorized, issued and fully paid and nonassessable.

(vi). The issuance of certificates for shares of Series B common shares on conversion of Series E Preferred Stock shall be made without charge to the Holder for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificate, provided that the Corporation shall be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder, and the Corporation shall not be required to issue or deliver such certificates unless or until the Person or Persons requesting the issuance thereof shall have paid to the Corporation the amount of such tax or shall have established to the satisfaction of the Corporation that such tax has been paid.

(e) Redemption.

(i) (i) Commencing ten (10) years after the Closing the holders of the Series E Preferred Stock at the request of the then holders of the Series E Preferred Stock, the Corporation will redeem the Series E Preferred Shares at a redemption price equal to the Purchase Price plus any accrued and unpaid dividends.

(ii). Shares of Series E Preferred Stock which have been redeemed or converted shall be deemed retired and shall thereafter resume the status of authorized and unissued shares of Preferred Stock, undesignated as to series, and may be redesignated and reissued as part of any new series of Preferred Stock other than Series E Preferred Stock.

(ii). No redemption shall be made and no sum set aside for such redemption at any time that the terms or provisions of any indenture or agreement of the Corporation, including any agreement relating to indebtedness, specifically prohibits such redemption or setting aside or provides that such redemption or setting aside would constitute a breach or default thereunder (after notice or lapse of time or both), except with the written consent of the lender or other parties to said agreement as the case may be.

(iii). If any redemption shall at any time be prohibited by any applicable law, the same shall be deferred until such time as the redemption can occur in full compliance with such law.

(iv). Whenever the Corporation is obligated to redeem a Holder's Series E Preferred Stock, and the Redemption Price is not paid to the Holder by the tenth (10th) business day after the Redemption Price is due and payable to such Holder, the Corporation shall thereafter pay interest to such Holder on the unpaid portion of the Redemption Price at the rate of ten percent (10%) per annum, until the Redemption Price is paid in full.

(v). If any shares of Series E Preferred Stock are converted pursuant to this Article VI, the shares so converted shall be canceled, shall return to the status of authorized, but unissued preferred stock of no designated series, and shall not be issuable by the Corporation as Series E Preferred Stock.

(vi). Upon receipt by the Corporation of (i) evidence of the loss, theft, destruction or mutilation of any Series E Preferred Stock certificate(s) and (ii) (y) in the case of loss, theft or destruction, of indemnity (without any bond or other security) reasonably satisfactory to the Corporation, or (z) in the case of mutilation, upon surrender and cancellation of the Series E Preferred Stock certificate(s), the Corporation shall execute and deliver new Series E Preferred Stock certificate(s) of like tenor and date. However, the Corporation shall not be obligated to reissue such lost or stolen Series E Preferred Stock certificate(s) if the Holder contemporaneously requests the Corporation to convert such Series E Preferred Stock.

(vii). The remedies provided in this Section 4 shall be cumulative and in addition to all other remedies available under these Articles, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit a Holder's right to pursue actual damages for any failure by the Corporation to comply with the terms of this Section 4. The Corporation acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holders of Series E Preferred Stock and that the remedy at law for any such breach may be inadequate. The Corporation therefore agrees, in the event of any such breach or threatened breach, that the Holders of Series E Preferred Stock shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(f). Rank. The Series E Preferred Stock shall, as to redemptions, and the distribution of assets upon liquidation, dissolution or winding up of the Corporation, rank (i) prior to the Corporation's Common Stock; (ii) prior to any class or series of capital stock of the Corporation hereafter created that, by its terms, ranks junior to the Series E Preferred Stock ("Junior Securities"); (iii) junior to any class or series of capital stock of the Corporation hereafter created (with the consent of the holders of a majority of the outstanding Series E Preferred Stock) which by its terms ranks senior to the Series E Preferred Stock ("Senior Securities"); and (iv) pari passu with any other series of preferred stock of the Corporation hereafter created (with the consent of the holders of a majority of the outstanding Series E Preferred Stock) which by its terms ranks on a parity ("Pari Passu Securities") with the Series E Preferred Stock.

(g). Liquidation Preference.

(i). In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series E Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders, before any payment shall be made to the holders of Common Stock or any other Junior Shares, an amount equal to the Purchase Price plus any accrued or unpaid dividends. A merger, acquisition or sale of all, or substantially all, of the assets of the Corporation in which the shareholders of the Corporation immediately prior to such event do not own a majority of the shares of the surviving corporation will be deemed to be a liquidation for the purposes of this Liquidation Preference. This Liquidation Preference will not apply in the instance where without such liquidation preference the liquidation of the Corporation would yield proceeds to the holders of Series E Preferred stock in excess of three (3) times the Purchase Price of the Series E Preferred Stock.

(ii). After the payment of all preferential amounts required to be paid to the holders of any class or series of stock of the Corporation ranking on liquidation prior and in preference to the Series E Preferred Stock and any other class or series of stock of the Corporation ranking on liquidation on a parity with the Series E Preferred Stock, upon the dissolution, liquidation or winding up of the Corporation, the holders of shares of Common Stock or any other Junior Shares then outstanding shall be entitled to receive the remaining assets and funds of the Corporation available for distribution to its shareholders.

(h). Voting Rights. The Holders of the Series E Preferred Stock have no voting power whatsoever with the exception of the rights granted pursuant to Section 4(j) Consent.

(i) Consent. The consent of the holders of at least two thirds of the outstanding Series E Preferred Stock (voting as a single on as converted basis) shall be required for any action (i) effects a merger or sale

of the Corporation, (ii) changes the rights, preferences, or privileges of any series of preferred stock, (iii) increases or decreases the authorized number of shares of any series of preferred stock, (iv) increases the number of directors to more than seven, (v) creates a new class of stock or shares with a preference over or parity with the Series E Preferred Stock with respect to voting, dividends, redemption or upon liquidation, (vi) redeems or repurchases any shares of preferred or common stock, (vii) amends the Corporation's charter or bylaws, or (viii) pays cash dividends on the Corporation's common stock.

(j) Information Rights. If a holder of Series E Preferred Stock continues to hold twenty five percent (25%) of the Series E Preferred Stock or Series B Common Stock issued to the such holder upon conversion of the Series E Preferred Stock, the Corporation will deliver to such holder annual and quarterly financial statements and an annual budget. The information rights obligation conferred upon the Corporation pursuant to this section will terminate at such time the Corporation consummates an initial public offering or becomes subject to the reporting requirements of the Securities Act of 1934.

(k) Co-Sale Rights. If at any time prior to an initial public offering a holder of the Corporation's common stock seeks to sell his shares to a party other than the Corporation, the holders of the Series E Preferred Stock will have the same right to participate in the transaction at the same terms and conditions as the selling shareholder on a pro-rata basis.

(l) Registration Rights. All shares of common stock issuable upon the conversion of the Series E Preferred Stock shall be deemed registrable securities.

3. **BOARD ACTION**. The Board of Directors of the Corporation unanimously approved these Articles of Amendment pursuant to unanimous written consent resolutions executed on (TBA) and directed that the Articles of Amendment be submitted to a vote of the shareholders of the Corporation.

4. **SHAREHOLDER ACTION**. On (TBA) these Articles of Amendment were approved by the unanimous written consent of the Directors of the Corporation.

IN WITNESS WHEREOF, the undersigned executes these Articles of Amendment to the Articles of Incorporation of the Corporation and certifies to the truth of the facts herein stated this (date TBA)

NEWPOINT FINANCIAL CORP.

By: ______________________

**APPENDIX I**

**NOTICE OF CONVERSION**
**AT THE ELECTION OF THE HOLDER**

(To be Executed by the Registered Holder in order to Convert the Series E Preferred Stock of Newpoint Financial Corp.)

The undersigned hereby irrevocably elects to convert the Series E Preferred Stock into shares of Newpoint Financial Corp. Series B Common Stock, as of the date written below. If shares are to be issued in the name of a person other than undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as reasonably requested by the Company in accordance therewith.

Conversion calculations:

________________________________
Date to Effect Conversion

________________________________
Number of Series E Preferred shares to be Converted

________________________________
Number of Newpoint Financial Corp. Series B Common Stock Shares to be Issued Upon Conversion

________________________________
Signature

________________________________
Name

________________________________
Address

Schedule 1

Purchaser(s)

**NEWPOINT FINANCIAL CORP.**
**Private Placement of Convertible Redeemable Preferred Stock**

| Name | Issue Date | No. of Shares |
|---|---|---|
| | | |
| TOTAL | | |

Schedule 1.1

<u>Disclosure Documents</u>

None, other than this Agreement.

Schedule 3.1(a)

<u>Subsidiaries</u>

Schedule 3.1(c)

Capitalization and Registration Rights

As of the date hereof, the Company is authorized to issues 500,000 shares of common stock with no par value.

Schedule 3.1(e)

Conflicts

None.

Schedule 3.1(f)

Consents and Approvals

None.

Schedule 3.1(g)

<u>Litigation</u>

None.





Schedule 3.1(h)

<u>Defaults and Violations</u>

None.